Laramore, Judge,
delivered the opinion of the court:
This is an action brought against the defendant as sub-lessee under a World War II lease between the plaintiff and the City of Macon, Georgia, covering the use of plaintiff’s Kaolin-bearing land adjacent to Camp Wheeler, Georgia, as a troop maneuver and training area. It is claimed that the use of the property as a firing range left it impregnated with an unknown quantity of unexploded shells which, unless and until they were removed as construably required by the restoration provision in the lease, created a condition too hazardous for the mining of kaolin, the purpose for which it was originally acquired by plaintiff, thus causing the damage sought to be recovered. The matter has been previously adjudicated by the District Court on a different theory of recovery, and resulted in an award unsatisfactory in amount to the plaintiff, affirmed on appeal, 214 F. 2d 284. It is now before this court pursuant to a resolution of the U.S. House of Representatives, H. Res. 250, 84th Congress, 1st Session.
The facts are these: In 1926 plaintiff acquired 175 acres of unimproved land hereafter referred to as tract 166. In 1940 it purchased 670 acres of adjoining unimproved land hereafter referred to as tract 113.
In 1940 the City of Macon, Georgia, undertook to obtain for the nearby and newly established Camp Wheeler the use of a quantity of land near the camp as a military maneuver or training area. At the request of the city officials and for *41 patriotic reasons the plaintiff, in October 1940, reluctantly leased to the City of Macon for a term running until June 30, 1945, later extended to June 30,1946, tracts 113 and 166 for the recited consideration of $1 per year. Later in 1940 the City of Macon sublet both tracts to the United States, along with other nearby properties similarly obtained from their owners, for use as a training area of adjunct to Camp Wheeler, all with plaintiff’s knowledge and reluctant permission.
The lease provided in part as follows:
* * * the Lessee, if required by the Lessor, shall, before the expiration of this lease, as the same is subject to renewal, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damage by the elements or by circumstances over which the Lessee has no control, excepted, * * *.
% * * * *
6. Any and all claims for damage to the leased premises and under the terms hereof are determinable according to the value of said premises as of the date of this lease, and no such damage shall be determined upon the basis of the appreciated value of said premises occasioned by the use of and/or development upon said property or surrounding properties by the lessee, successors, assigns, or sublessees. * * *.
Pursuant to the lease and sublease, defendant occupied and used the premises as a military training ground and principally used it as a firing range from which missiles were fired from 105 mm. howitzers, 60 mm. and 81 mm. mortars, machine guns and 30 caliber rifles. Among the many thousands of rounds fired were missiles of various types, including among them high explosive shells, which fragmen-tized on detonation. The other nonexplosive type shells do not fragmentize on detonation and are dangerous to personnel and property only through exposure at close range to their emission of fumes or chemical heat, as contrasted to the lethal characteristics of the exploding HE (high explosive) type of shell.
Of the many thousands of shells fired from 1941 to 1945, a small percentage, numerically numerous, were duds, i.e., shells that failed to detonate upon contact with the targets *42 due to defect or accident. Dud 60 mm. and 81 mm. mortar shells were more common than dud 105 mm. howitzer shells. It was the military practice to place a warning flag on the location of each dud as its failure to detonate was observed, and at the close of each day’s activities to retrieve or otherwise dispose of the duds. It cannot be said that all were discovered in these daily procedures. Because of their steep trajectory, their weight and shape, and their velocity in descent, dud mortar and howitzer shells which failed to detonate on landing buried themselves either wholly or partially as deep as six feet in the earth at the point of contact, depending on the texture of the earth. A buried dud shell of the size here involved leaves a small hole to signal its presence. Its location is often difficult to detect, however, due to closing of the aperture by erosion of the soil in the passage of time. Erosion also sometimes reveals buried shells by washing away the earth covering, particularly on hillsides.
Upon the expiration of the lease on June 30,1946, plaintiff requested the return of its property and was informed that the property would be released as soon as “dedudding” of the premises was completed. “Dedudding” referred to the defendant’s procedure to search the tracts and remove therefrom all unexploded ammunition so as to render the property safe for use.
The defendant then made a good faith effort to denude the property of unexploded ammunition, and finally informed plaintiff that the property was ready for re-entry upon stated conditions. However, the defendant has never been able to absolutely assure plaintiff that mi unexploded ammunition remained on the land. In early 1947 plaintiff re-entered into possession of the land. In 1950, 1951, 1952, and 1956 unexploded shells were found by plaintiff’s employees on its land.
The evidence shows that there was buried and undetected at various and unknown locations within the top six feet of tract 113, a small number of unexploded HE shells, lethal in character, and a larger, but not large, number of smoke, training, illuminating, and practice shells. Presence of the HE shells would constitute a physical hazard to personnel and equipment engaged in mining. Presence of the other shells *43 would constitute a mental hazard to personnel, but not a substantial physical hazard to either personnel or equipment. These conditions do not pertain to tract 166, which is safe to mine.
Tract 113 contains 2,700,000 cubic yards of commercially mineable kaolin. The top six feet of the overburden contains 875,000 cubic yards of earth. Because of the hazardous condition of tract 113, as previously described, the only feasible method of removing the kaolin deposits with a minimum of risk to personnel and equipment is to first remove the top six feet of overburden with specially armored earthmoving equipment. The additional cost of such an operation would average 12 cents per cubic yard, at times material to this litigation, representing principally the cost of armoring the equipment, the loss of efficiency inevitably resulting from the use of armored equipment, and the cost of additional insurance to protect both personnel and equipment against the consequence of injury and damage. Thus it would cost $105,000 more to remove the top six feet of overburden from the mineable areas of tract 113, because of the conditions complained of, than if the tract were unaffected by such conditions.
In 1949 the present plaintiff filed suit in the U.S. District Court for the Middle District of Georgia to recover damages in the sum of $2,150,876.28 for diminution in the value of its land. Jurisdiction was conferred upon the District Court by a special act of Congress, 62 Stat. 566, which permitted the plaintiff to sue the Government for any claim arising under the lease agreement plaintiff had with the City of Macon.
In the District Court action, judgment was rendered against the United States in the sum of $22,537.50, which represented the difference between the value of the land at the time of the lease and its diminished value because of its use and the condition in which it was returned to the owner. This judgment was affirmed by the U.S. Court of Appeals for the Fifth Circuit (Georgia Kaolin Co. v. United States, 214 F. 2d 284 (1954) cert. denied 348 U.S. 914). Plaintiff has refused to accept payment of the judgment, although tendered by defendant.
*44 The U.S. Court of Appeals in a well-reasoned opinion, held that the above judgment represented all that plaintiff was legally entitled to.
Plaintiff thereafter sought relief in Congress because of its dissatisfaction with the District Court’s decision.
The instant petition was brought pursuant to the mandate of House [Resolution 250, 84-th Congress, 1st Session, which provides as follows:
Resoloed, That the bill (H.R. 6401) entitled, “A bill for the relief of the Georgia Kaolin Company,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal and equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
The theory urged by plaintiff in the District Court was that it should be “paid the full money value of the kaolin in the ground, arrived at in money per ton, on a comparable royalty basis; * * 214 F. 2d 285.
[Recovery is sought in the present case on the theory that plaintiff should be paid the added cost of removing the six foot layer of earth because of its dangerous condition.
Clearly, plaintiff would not be legally entitled to a judgment in this court because of the doctrine of res judicata, the District Court having disposed of the issues on the merits. Commissioner v. Sunnen, 333 U.S. 591; Southern Pacific Railroad Company v. United States, 168 U.S. 1; Cromwell v. County of Sac, 94 U.S. 351; Buch Express, Inc. v. United States, 136 C. Cls. 635; Southern Maryland Agricultural Association v. United States, 137 C. Cls. 176.
The plaintiff having no legal claim against the United States, brings to bear the question of whether or not it has an equitable claim and in what amount, if any.
In determining this question we think “equity” could only apply in its broad and moral sense, which in the final analysis *45 amounts to a gratuity grounded in tbe precepts of the conscience, not in any sanction of positive law. Gay Street Corporation v. United States, 130 C. Cls. 341.
Based upon this theory, we think the United States ought to reimburse plaintiff for increased costs resulting from the defendant’s use. Our conclusion in this respect is arrived at for these reasons: Plaintiff, the operator of a profitable kaolin mining and producing corporation, acquired the land in question solely for the production of kaolin. Plaintiff for patriotic reasons leased the land in question for $1 per year in order that troops could be trained thereon in furtherance of the war effort. Plaintiff was promised the return of the land in the same condition as it was at the time of leasing. This was not done. In spite of the effort of defendant to clear the area, numerous unexploded shells remained on the premises. Under these conditions it would be necessary for plaintiff to spend additional sums of money in its mining operation. This is because of the necessity to armor plate the bulldozers, expend additional time, pay increased insurance costs and other related expenses.
The facts show that because of the above conditions, the increased costs of removing the overburden is in excess of the fair market value of the land determined either at the time the lease was entered into or at the time the land was returned to plaintiff. It is for this reason we believe the doctrine of equity, supra, should be invoked. This is so because the land is of no great value to anyone but the plaintiff. Plaintiff’s processing plant lies in the immediate vicinity and it is not economically feasible to haul crude clay more than 15 miles to a processing plant. Thus the true value of the property can only be ascertained by looking to its intended use by plaintiff.
To preserve and exploit its value it would be necessary for plaintiff to expend an additional 12 cents per cubic yard to remove the top six feet of overburden in the contaminated area. We have found that tract 166 presents no hazard to mining and no amount should be allowed for its restoration. However, tract 113 does present a problem which would require the additional cost to remove 875,000 cubic yards of overburden. This amounts to $105,000 which we believe the *46 plaintiff is equitably entitled to recover, less the amount of the District Court’s judgment.
Madden, Judge, concurs.