Laeamoee, Judge,
delivered the opinion of the court:
Through this congressional reference[1] we are asked to pass upon plaintiffs’[2] claim against the United States for *109 losses arising out of certain shipments of potatoes made in 1956 by plaintiffs to Swedish purchasers. Plaintiffs’ claim is premised on an alleged misrepresentation by an agent of the United States that the potato shipments in question would meet the import requirements of the Kingdom of Sweden. Specifically, plaintiffs allege that the Chief Staff Officer of the Plant Quarantine División, Agriculture Research Service of the United States Department of Agriculture, failed to inform them of the existence of a regulation promulgated by the Kingdom of Sweden in 1955 which prohibited potatoes infected with “ring rot”[3] from being imported into .that country.
At the outset, it should be pointed out that even if in fact there was a negligent misrepresentation by an employee or official of the United States, no legal liability would exist against the United States, as a sovereign, for the Federal Torts Claim Act specifically exempts from its purview “[a]ny claim arising out of * * * misrepresentation * * 28 U.S.C. § 2680 (h). Thus plaintiffs’ right to recovery, if any, must be based on an “equitable claim” as that term is used in the statutory enactment which confers jurisdiction upon this court in congressional reference cases. 28 U.S.C. § 2509 (1958 Ed.). Plaintiffs argue that they have an “equitable claim” within the meaning of section 2509, supra, since they would have been entitled to recover from defendant were defendant a private individual rather than the sovereign. Plaintiffs claim that pursuant to section 104 of the Department of Agriculture Organic Act of 1944, 7 U.S.C. § 147a(b) (1958 Ed.), the United States assumed a duty to certify the conformity of United States agricultural products with foreign import regulations and that the United States official in charge of carrying out this duty failed to use due care in discharging his statutory obligation. We need not determine whether or not section 104 of the Department of Agriculture Organic Act imposed on defendant the *110 alleged duty, for it is our judgment that plaintiffs’ own negligence vitiates any “equitable claim” which might have existed.[4]
Commissioner Gamer has rendered a most comprehensive, careful and detailed report in which he has drawn elaborate factual conclusions as to how the losses herein incurred by plaintiffs could have been avoided. In them, the Commissioner finds that if due care had been exercised by at least one of the parties to the transaction in fully investigating the existing Swedish regulations, the losses could have been avoided. It is fair to say that embodied in these factual conclusions is a finding that all the parties to the instant transaction were guilty of some degree of negligence. Plaintiffs have excepted to none of the Commissioner’s findings. The defendant has filed certain minor exceptions which we have considered. It is apparent, however, that the parties agree on the basic facts of this case as found by the Commissioner. We, too, accept and adopt the findings of the Commissioner and make them the foundation of our legal determination.
In the early months of 1956 there was a shortage of potatoes in many European countries, resulting from a severe drought during the previous summer months. In addition, an unusually severe 1955-56 winter caused the belief that this shortage would be aggravated because of expected freezing damage to potatoes stored in ground pits. The Dutch potato brokerage firm of Wolf & Wolf, N.V. determined that because of this potato shortage there would be a market for small United States potatoes in Sweden. Consequently, a member of this firm, Mr. Izaak Wolf, contacted an official of the United States Department of Agriculture in Washington, with the view to determining where in the United States potatoes could be purchased at the lowest price for export to Europe. He was advised that for European export, potatoes grown in Aroostook County, Maine, offered *111 the lowest prices and freight charges. At this time, there was no reference to the import regulations of any particular European country.
At about the same time, Arnold Wolf, one of the plaintiffs in the instant suit and the president of the Dutch brokerage firm of Wolf & Wolf, contacted Swedish commercial channels to ascertain whether they would be interested in purchasing table potatoes from the United States. Arnold Wolf obtained from such commercial sources a form of Swedish phytosanitary certificate containing the Swedish import requirements.[5] The form of certificates he obtained did not specifically mention “ring rot” as one of the diseases which Sweden considered dangerous thus preventing the importation of potatoes so infected. Sweden, by a promulgation issued on September 19, 1955, had added “ring rot” to the list of diseases which it considered to be dangerous.[6] At this time, Arnold Wolf made no inquiry from any Swedish governmental source as to Swedish import regulations, nor did he obtain such regulations from any commercial or governmental source. It appears that following the practice of the trade, Arnold Wolf relied upon the Swedish prospective purchasers’ own knowledge of both the products that could be imported into their country and the conditions under which such products are permitted entry.
Shortly thereafter, Arnold Wolf returned to the United States with the Swedish phytosanitary certificate, leaving it with his Wolf & Wolf associate, Izaak Wolf, for the purpose of determining whether officials of the State of Maine could execute it in connection with the contemplated export of Maine potatoes. A month later, Izaak Wolf went to Maine and contacted E. L. Newdick, Chief of the Division of Plant Industry, Department of Agriculture of the State of Maine, *112 in an effort to get Maine inspectors to execute the Swedish phytosanitary certificate. Newdick advised Izaak Wolf that his department could not certify, as the Swedish certificate required, that Maine potatoes had been grown in an area where Colorado beetle did not occur. At that time the Maine Department of Agriculture was not aware of the new Swedish ring rot regulation because, as set forth more fully below, the United States Department of Agriculture had not as yet issued the new summary of Swedish regulations.[7]
Although the importation into Sweden of United States potatoes had been prohibited since 1876 to prevent the introduction into Sweden of the Colorado potato beetle, the Swedish Plant Protection Institute, whose function is to provide an effective control and inspection service, could grant exceptions. For this reason Newdick telephoned II. J. Conkle, chief staff officer of the Plant Quarantine Division, Agricultural Research Service of the United States Department of Agriculture, who was in direct charge of export certification matters, to make certain that there had not been any waiver by Sweden of the Colorado beetle prohibition. Conkle informed Newdick that he knew of no such waiver, and that without such a waiver by Sweden of the requirement, it would not be possible for any United States inspector to execute the Swedish certificate.[8] He further told Newdick to advise Wolf’s firm to secure such a waiver from the Swedish Plant Protection Service and have such a waiver transmitted to him. Newdick so advised Izaak Wolf. There was no discussion of the ring rot prohibition between Conkle and Newdick, although Conkle’s office had received a copy of the promulgation translated into English in the Fall of 1965.[9] At this time, the Swedish promulga *113 tion was in the process of being summarized by tlie New York Office of the Agricultural Research Service.
A few weeks prior to the telephone conversation between Newdick and Conkle, the Agricultural Attache of the American Embassy in Sweden, advised the United States Department of Agriculture that the Swedish Agricultural Marketing Board had granted some licenses to Swedish importers to import a small amount of Maine potatoes on a trial basis. Enclosed with this communication were sample copies of .the required Swedish phytosanitary certificates which had been made available by Dr. I. Granhall, the Director of the Swedish Plant Protection Institute. The enclosed samples were identical with that which Arnold Wolf had obtained from Swedish commercial sources and did not mention ring rot. A meeting of several United States Department of Agriculture officials was called to discuss the general problems involved in exporting United States potatoes to Sweden. Conkle was present at the meeting and was requested to furnish information with regard to the Swedish requirements on the importation of potatoes. There was no mention of ring rot at this meeting, although the Swedish regulation concerning ring rot was available in Conkle’s office.
Shortly after speaking with Newdick, Izaak Wolf cabled Arnold Wolf in Holland advising that a waiver of the Colorado beetle prohibition of the Swedish certificate had to be obtained and requesting him to obtain such a waiver and to advise Conkle thereof immediately by cable.
The first contact between Izaak Wolf and Conkle occurred the following day when Wolf telephoned Conkle to inquire whether he had as yet heard from Sweden regarding the waiver. Conkle informed him that he had not as yet been so advised.
Pursuant to Izaak Wolf’s cable, Arnold Wolf went to Sweden and conferred with Granhall about the Swedish requirements for importing potatoes from the United States, and particularly about the inability of the Maine Department of Agriculture to execute the Swedish phytosanitary certificate because of the Colorado beetle prohibition. Gran-hall, motivated by the existing potato shortage, agreed to *114 the importation of Maine potatoes provided the bags containing them were treated with a chemical called rotenone, that the other requirements of the Swedish regulations were complied with, that valid certificates accompanied the shipments, and that they passed Swedish inspection on arrival. Again, ring rot was not mentioned at this conference although Granhall, as a plant pathologist, well knew that ring rot exists in potatoes grown in the United States.
Granhall cabled Conkle at the United States Department of Agriculture in Washington that .the Colorado beetle prohibition had been waived provided the bags were treated with rotenone from the outside. Conkle in turn transmitted this information to Newdick in Maine, who likewise advised Izaak Wolf .that it would now be possible for Maine to execute the Swedish certificate. Izaak Wolf confirmed this information by a telephone call to Conkle.
Plaintiffs thereafter entered into contracts with various Swedish purchasers for the importation of potatoes and contracted for the purchase from both American and Canadian producers of the required amounts. Subsequently, Maine Department of Agriculture officials inspected, by random sampling, plaintiffs’ shipments and certified the required Swedish phytosanitary certificates.
In the meantime, what was feared to be a potato shortage turned out to be a surplus due to the discovery that the potatoes which had been stored in the ground storage pits were in good condition. This caused the collapse of the potato prices in Sweden. This event transpired just prior to the arrival in Stockholm of plaintiffs’ first shipment of potatoes. Also, just prior to the arrival of the first vessel, ring rot was discovered on some Swedish potato farms. This was the first time any real concern about ring rot was felt in Sweden.
The discovery of ring rot in Sweden, and the fact that the potato shortage no longer existed, led to a decision by the Swedish authorities to invoke the “ring rot” prohibition promulgated on September 19, 1955. Upon the arrival in Sweden of plaintiff’s potato shipments, the cargo was inspected, found to contain ring rot, and rejected. As a *115 result of this embargo, the plaintiffs suffered losses as set out in detail in our findings of fact. Plaintiffs’ petition seeks the recovery of 50 percent of the total loss sustained.
As stated above, the Commissioner has made elaborate factual conclusions as to' how the losses herein incurred by plaintiffs could have been avoided. From the Commissioner’s factual conclusions, which have been adopted by the court, we have determined that all the parties to the instant transaction were guilty of some degree of negligence. We shall treat each party separately.
It is evident that had the prospective Swedish importers made an attempt to ascertain fully the laws and regulations of their own country before attempting to import the potatoes, they would have learned about the “ring rot” prohibition. As a result of this failure to investigate fully, a charge of negligence on the part of the Swedish importers can be fairly sustained.
We believe that plaintiffs should have obtained directly from Swedish official channels a complete set of Sweden’s then existing regulations before they embarked upon this unusual Swedish-United States potato deal. Admittedly, plaintiffs followed the custom and usage of the trade and relied on the Swedish importers. However, the contemplated transaction was not an ordinary one, for the importation into Sweden of United States potatoes, prior to the instant transaction, had been prohibited. For this reason, we believe that plaintiffs should have ascertained for themselves the requirements of the importing country, especially since they had direct contracts with the proper Swedish officials. Plaintiffs were not novices in the potato business. Arnold Wolf, one of the plaintiffs in the instant suit, had 34 years’ experience as a potato broker. He had in his possession a Swedish phyto-sanitary certificate which stated that the shipment would have to conform “with the current phytosanitary regulations of Sweden both as stated in the [certificate] * * * and otherwise.” [emphasis supplied] A cursory reading of the certificate would indicate that the certificate in question did not explicitly set out all of Sweden’s current regulations. Thus, we believe that when faced with .this warning it was *116 incumbent upon plaintiffs to ascertain definitely for themselves the current regulations of the importing country. Failure to do so, we believe, shows extreme lack of due care on the part of plaintiffs. In these circumstances, it is fair to say that the record clearly supports a finding by this court that plaintiffs were extremely negligent in the conduct of their business.
If a culprit had to be singled out as being primarily responsible for plaintiffs’ losses, we would have to place the blame on Granhall, the Director of the Swedish Plant Protection Institute. For it was he who was responsible for, and indeed was the author of, the “ring rot” regulation. Furthermore, as an experienced plant pathologist, he was well aware that ring rot exists in potatoes grown in the United States. Thus, when he was approached by Arnold Wolf with respect to the possibility of the Colorado beetle waiver, he should have informed plaintiffs of the recent “ring rot” regulation. Failure to do so misled plaintiffs into believing that the prospective potato shipments would meet Sweden’s import requirements. The same is true of Granhall’s contacts with the American Embassy, for at that time Granhall delivered to the Embassy a form of the Swedish phytosanitary certificate which did not contain the recent “ring rot” regulation.
Since the Swedish officials were, in this instance, accepting certificates executed by State rather than Federal officials, we believe it was ultimately Newdick’s responsibility to make certain that his certification was accurate. Although technically the certificates executed by the Maine officials were accurate,[10] we believe that if an independent investigation of Sweden’s current regulation had been made, plaintiffs’ losses would have been prevented. It appears that the Maine officials had the last chance to prevent the resulting losses. The Commissioner has found that Newdick was conscious of the ring rot problem and indeed was puzzled by the seeming absence from the certificate of a Swedish regulation with *117 respect .thereto. His failure to make a direct inquiry about “ring rot” in view of Ms previous experience and awareness of the problem, shows a lack of due care in the performance of his duties.
We now turn to the party upon whom plaintiffs attempt to place the blame for their losses. There is no doubt that Conkle, as the United States official in charge of certification matters, was in a position to have ascertained the existence of the “ring rot” promulgation and advise all interested parties. The record supports a charge that Conkle was negligent in the performance of his duties when he failed to furnish the current Swedish import requirements at the meeting held by the officials of the United States Department of Agriculture. The record also supports an inference of undue delay on the part of Conkle’s department in summarizing the “ring rot” regulation. With regard to plaintiffs’ charge that Conkle was guilty of a negligent misrepresentation when he gave “seeming assurances” that, with the Colorado beetle waiver, there was no obstacle to the certification and the importation, we are not so sure that the record supports the conclusion urged by plaintiffs. The extent to wMch plaintiffs relied on Conkle’s “seeming assurances” is not clear. Furthermore, neither plaintiffs nor Newdick asked Conkle to supply them with the current Swedish regulations. Their contacts with tMs United States official were limited to the question of the Colorado beetle waiver. Thus there was never a duty imposed on Conkle, independent of one that might be levied by statute, to inform plaintiffs of the current Swedish regulations.[11] However, even if in fact there was a negligent misrepresentation on the part of Conkle, plaintiffs would not be entitled to recover, for we have concluded that plaintiffs’ own negligence obviates any “equitable claim” wMch might have existed against defendant within the meaning of section 2509, supra.
In defining “equitable claim” as that term is used in section 2509, supra, we have not adhered to strict equitable precepts as they are administered by a court of equity (Burkhardt v. *118 United States, 118 Ct. Cl. 658, 84 F. Supp. 553 (1949)) but have looked to broader moral principles of right and justice. Georgia Kaolin Co. v. United States, 145 Ct. Cl. 39; see Estate of Fairbanks v. United States, 164 Ct. Cl. 1, 8. In other words, if the conscience and honor of the sovereign dictates that plaintiffs be recompensed for their losses, an equitable claim exists. However, we believe that in the instant case, no general principles of right and justice, such as would be binding on the conscience or the honor of the United States, require that plaintiffs be recompensed for the losses they suffered and which were in great part due to their own negligence. Having balanced defendant’s acts of negligence, which are the basis of the equitable claim before us, against plaintiffs’ failure to exercise due care in the conduct of their business, we reach the conclusion that the latter clearly outweighs the former.
Although they had every opportunity to ascertain for themselves the current Swedish regulations, plaintiffs failed to do so. We cannot escape the conclusion that plaintiffs were extremely negligent in view of the unique transaction which was contemplated. Consequently, we believe that defendant’s acts of negligence were too remote to be the proximate cause of plaintiffs’ losses. The meeting of the Department of Agriculture officials did not have any direct bearing on plaintiffs’ shipments. The fact that Conkle was negligent in failing to furnish the “ring rot” promulgation at the meeting should not be determinative in imposing the responsibility for plaintiffs’ losses on defendant. Furthermore, the fact that there was an undue delay in summarizing the “ring rot” regulation is not sufficient cause to place the blame for plaintiffs’" losses squarely on defendant, for as we have stated above, plaintiffs could have obtained the current Swedish regulation from official Swedish channels if they had exercised due care in the conduct of their business. Moreover, as stated earlier, plaintiffs had direct contact with the person who was responsible for, and indeed was the author of the “ring rot” regulation. If that official had exercised due care in the performance of his office, he could have informed plaintiffs of the recently promulgated regulation. Furthermore, it appears that the ultimate responsi *119 bility to make certain tliat the certification was accurate was on tbe Maine officials. They had the last opportunity to prevent the losses incurred herein. In view of the negligent acts of the other parties to this transaction, we do not believe that the conscience and honor of the United States dictate the result sought by plaintiffs, i.e., that they be recompensed for the losses suffered.
In sum, it is our judgment that plaintiffs have neither a legal nor equitable claim against the United States for their losses suffered.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Eepresentatives pursuant to H.E. 489, 85th Cong., 2d Sess.

 Since the hearings in this case were held prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962) and the findings of the commissioner reported just three days after that opinion was rendered, we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Consequently, defendant’s belated attack on the jurisdiction of this court is denied.

 Plaintiffs in this case are James William O’Donnell, Salvitore de Tucci, and Arnold Wolf, doing business as Suffolk Farms Packing Company, a partnership, with offices in Chelsea, Massachusetts.

 At that time, a Swedish statute provided that fruits, plants, and vegetables Infected by plant diseases or parasites listed by the Swedish Board of Agriculture as being particularly dangerous to Swedish plants could not be imported. The Swedish Board of Agriculture, by a promulgation issued on September 19, 1955, added “ring rot” to the list of diseases which Sweden considered to be dangerous.

 We are not holding that in every instance in which plaintiffs are guilty of negligence, this by itself vitiates any “equitable claim” which might have existed within the meaning of section 2509, supra. A determination must be made on a case-by-case basis, and in so doing we must balance the strength of plaintiffs’ “equitable claim” with the degree of negligence which can be attributed to them. As shown in our discussion below, plaintiffs’ negligence clearly tips the scale against them.

 The form of the phytosanitary certificate is substantially the same in all the countries subscribing to the Rome Convention. In addition to containing a general statement to the effect that the consignment covered thereby “is believed to conform with the current phytosanitary regulations of Sweden” it carried space for “additional declaration” in which any particular statements concerning the individual importing country’s restrictions could be inserted. Thereunder it contained no mention of ring rot, but did specifically refer to Colorado beetle, three other pests, and one other disease.

 See footnote 3, supra. Potatoes infected with ring rot are not dangerous for human consumption. The danger arises from potatoes so infected being used as seed potatoes. Where so used, the disease may settle in the soU and spread throughout the country.

 The latest summary of Sweden’s “Plant Quarantine Import Restrictions” which Newdick checked was published by the Department of Agriculture on February 14, 1950.

 Many foreign countries will accept certifications by State as well as Federal officials, and the states for the most part rely on the data furnished by the United States Department of Agriculture. We do not go into the question of whether the Maine officials who ultimately certified the shipments in question derived their power from the Federal Government or whether they acted independently.

 Approximately a year elapsed between the receipt of the promulgation in translated form by the Department of Agriculture in November of 1955 and its final publication in summary form in November of 1956.

 The Maine officials certified that “to the best of * * * [their] knowledge * * * [the shipments were] substantially free from injurious diseases and pests” and that they were “believed to conform” with Sweden’s regulations.

 Consequently, plaintiffs only recourse would be that section 104 oí tbe Department of Agriculture Organic Act, supra, imposed tbe required “duty”. However, as stated above, we need not pass on tbis question.