Bx the Review PaNel :
On July 30, 1971, by S. Res. 46, 92d Cong., 1st Sess., the Senate referred the bill numbered S. 634, 92d Cong., 1st Sess., to the Chief Commissioner of the Court of Claims pursuant to sections 1492 and 2509 of Title 28, U.S.C., for further proceedings in accordance with applicable law.
*1070 The Chief Commissioner referred the case to Trial Commissioner Joseph V. Colaianni for proceedings in accordance with the applicable rules and designated the above members of the Keview Panel to consider the trial commissioner’s decision on the merits of plaintiff’s equitable or legal right to recover.
Based upon a stipulation of the parties, Commissioner Colaianni, on August 31, 1973, reported his decision, concluding: (1) that Michael D. Manemann has no legal claim against the United States; (2) that Michael D. Manemann does have a valid equitable claim against the United States based on the negligence of defendant’s doctor; and (3) that the amount of $27,000 is equitably due from the United States to the plaintiff.
Thereafter, on September 14, 1973, the parties filed their joint motion to adopt the report of Commissioner Colaianni. Upon careful consideration of Commissioner Colaianni’s report and the aforesaid joint motion of the parties, the Beview Panel is in unanimous agreement with Commissioner Colaianni’s opinion and findings of fact, and conclusions as hereinafter set forth. The Beview Panel, therefore, adopts the same without oral argument as the basis of its recommendation that plaintiff has a valid equitable claim against the United States and that the amount of $27,000 is equitably due from the United States to the plaintiff.
This determination is accordingly submitted to the Chief Commissioner for transmittal to the United States Senate.
OPINION OE THE COMMISSIONER*
Colaianni, Commissioner:
On July 30, 1971, by S. Bes. 46,92d Cong., 1st Sess., the Senate referred the bill numbered S. 634,92d Cong., 1st Sess., to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. § 1492.
The bill involved in this referral, S. 634, is entitled “A bill for the relief of Michael D. Manemann.” The bill proposed that the Secretary of the Treasury be authorized and directed *1071 to pay to Michael D. Manemann a sum of money, the original bill did not specify the exact amount, in full satisfaction of all his claims against the United States—
* * * for permanent physical disability suffered by him as the result of advanced tuberculosis which medical personnel of the United States Air Force negligently failed to diagnose in January 1962, even though X-ray photographs taken at that time by such personnel clearly disclosed the presence of active tuberculosis in the lungs of the said Michael D. Manemann, the presence of such disease not having been discovered until March of 1965 when the said Michael D. Manemann received his pre-induction physical examination * * *.
In referring S. 634 to the Chief Commissioner of the Court of Claims, S. Kes. 46 directed that proceedings be conducted in accordance with 28 U.S.C. §§ 1492 and 2509 and that, after such proceedings, a report be submitted to the Senate—
* * * giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
The petition of Mr. Manemann was filed with the Clerk of the Court of Claims on October 13, 1971, and defendant’s answer was filed on February 11,1972. Thereafter the parties engaged in extensive negotiations in an attempt to reach an agreement on the disposition of the controversy. As a result, and in lieu of trial, the parties filed, on November 9, 1972, a stipulation which was intended to accurately set forth defendant’s negligence and the compensation which would satisfy plaintiff’s equitable claim against defendant. Particularly, after detailing all of the pertinent facts, the parties have stipulated that the claimant does not have any legal claim against the United States, but does have a valid equitable claim and is entitled to receive the sum of $27,000 on such equitable claim.
The stipulation is accepted and approved by the trial commissioner, and this report is based on its provisions.
*1072 In accordance with the stipulated agreement of the parties, as accepted and approved by the trial commissioner, the Senate should be informed:
(1) that Michael D. Manemann has no legal claim against the United States;
(2) that Michael D. Manemann does have a valid equitable claim against the United States based on the negligence of defendant’s doctor; and
(3) that the amount of $27,000 is equitably due from the United States to the claimant.
FINDINGS oe Fact
1. The claimant is a 28-year-old former dependent of an Air Force member. He currently resides in Colorado Springs, Colorado, and is employed as a maintenance man.
2. The case presents certain claims, totaling $80,000, as compensation for loss of earnings, for pain and suffering incurred during eleven months of hospitalization and surgery, and for permanent partial disability as a result of having had advanced tuberculosis.
3. In January 1962, while attending a United States military-run school in Formosa, claimant underwent a tuberculin skin test which was found to be positive. On January 16, 1962, he had an X-ray picture taken of his chest at the 6211th United States Air Force Dispensary in Taiwan. The Air Force doctor who analyzed the X-ray reported it as showing a “Neg chest.” The claimant’s medical records do not show any further action in Taiwan after this negative report.
4. Claimant reports that he felt well until around February 1965, when he noted he was having frequent “colds” along with increased lethargy. Medical records show that, prior to that time, claimant sought treatment at Air Force medical facilities on two occasions, one an outpatient visit relating to a back ailment in March 1963, and the other an outpatient visit relating to a minor eye injury in May 1963.
5. On March 25, 1965, the claimant underwent a routine physical examination in Denver, Colorado, preparatory to his induction into the military service. A routine X-ray taken at that time was found to be abnormal, showing an infiltrate and cavitary lesion in the left lung.
*1073 6. On March 26,1965, he was admitted to Fitzsimons General Hospital in Denver for further examination and treatment. X-ray pictures taken of his chest on March 26, 1965, disclosed a nodular infiltrate throughout the left lung with a thin-walled cavity in the left upper lobe. The diagnosis was pulmonary tuberculosis, far advanced, left upper lobe, cavi-tary, and left lower lobe, active.
7. On March 27, 1965, claimant was started on isoniazid and streptomycin. His sputum cultures subsequently were returned as being Mycobacterium tuberculosis resistant to isoniazid and streptomycin. Because of this, he was switched to an altered drug regimen on April 20, 1965, consisting of isoniazid, capreomycin, ethionamide, and pyridoxine. By July 22, 1965, the infiltrate was cleared through drug therapy. Some reduction of the cavity was also accomplished.
8. After six months of drug therapy, cavitary closure was obtained and the recommendation at that time was pulmonary resection. Consequently, on November 4,1965, he underwent an apical posterior segmental resection of the left upper lobe, with wedge resection of a portion of the anterior segment. Because of postoperative complications, repeat surgery was performed on November 29,1965, with a total left upper lobectomy. The remainder of his postoperative period and further hospital course was uneventful.
9. On February 17, 1966, the claimant was discharged from Fitzsimons General Hospital and placed on prescribed medication. He was also instructed to report to the Outpatient Tuberculosis Clinic at Fitzsimons periodically for check-ups. He visited the clinic monthly for the following year, during which time no symptoms or signs of the disease reappeared. At the time of one of his visits to the clinic in January of 1967, it was reported that he was then employed in fairly heavy work and tolerating it well. His last visit to the clinic was on February 9,1967, at which time it was understood that he would have periodic check-ups at a local county clinic. It was later reported that he was making satisfactory progress.
10. Claimant’s entire treatment while at Fitzsimons General Hospital, including all outpatient services and medica- *1074 fcion, was at tbe expense of the Government and no charge was ever made to claimant for these services.
11. In response to interrogatories submitted by defendant, claimant averred that his employment, as an auto mechanic, was terminated on March 26,1965, by reason of his hospitalization at Fitzsimons General Hospital and that he was earning an average of $335.00 per month at that time.
12. In further response to the interrogatories, he stated that he was unable to work for 21 months, from March 26, 1965, to January 2,1967, as a result of the tuberculosis.[1] He also stated that he held positions as an auto mechanic since his treatment and that his average earning for the two months immediately subsequent to his resumption of work was $365.00 per month. He further responded that he is currently engaged as a maintenance man at $425.00 per month.
13. On September 29,1966, the claimant filed a suit against the Government under the Federal Tort Claims Act in the United States District Court for the District of Colorado. The suit was based upon the same allegation of negligence as in the present suit. On January 4,1967, the court granted the Government’s motion for summary judgment which was based upon the exception to the Federal Tort Claims Act, as set forth in 28 U.S.C. § 2680 (k), which provides that the Act does not apply to any claim which arises in a foreign country. The claimant appealed this decision to the United States Court of Appeals for the Tenth Circuit, which affirmed the lower court’s decision on August 23, 1967. Manemann v. United States, 381 F. 2d 704 (10th Cir. 1967). [2]
14. Claimant filed a petition in the Court of Claims on October 13,1971, pursuant to S. Ees. 46, which referred this case to the Chief Commissioner, claiming negligence on the part of the Air Force and damages for pain and suffering, *1075 loss of earnings, and residual disability as a result of an alleged misreading of an X-ray film in 1962.[3]
15. In 1966 and 1967, at claimant’s request two physicians rendered evaluations of the 1962 film, concluding generally that a little shadow found in the apex of the left lung field, while not indicative of an active tuberculous focus,, was highly suspicious and should have prompted further studies.
16. One of these doctors, Dr. Milton L. Wiggins, of Colorado Springs, Colorado, by letter dated December 9, 1967, further stated:
Has [sic] such studies been performed in 1962, it is probable that tuberculosis germs would have been found and a course of appropriate anti-tuberculosis drugs could have been started. Even if tuberculosis germs were not found by these means in 1962, in_my opinion the x-ray findings were sufficiently suggestive of active tuberculous disease that I would have recommended that Michael be treated with anti-tuberculosis drugs (Isoniazid, Para-aminosalicylic Acid, and Pyridoxine) for a period of at least 18 months. Such treatment, after a brief period of hospitalization, could probably have been continued outside the hospital with little restriction of normal activity. Had this been done it is highly improbable that Michael would ever have had reactivation of tuberculous disease, or would ever have required chest surgery.
17. Dr. William PI. Eyder, who supervised claimant as a clinic patient at the El Paso County IPealth Department subsequent to his release from the outpatient clinic at Fitz-simons, by letter of February 14,1968, to claimant’s attorney also stated, “There is also no question in my mind that his residuals would be considerably less had it been possible to institute therapy in early 1962, assuming a positive diagnosis of Tuberculosis had been made then.”
18. Concerning residual disability, the physicians render- _ ing an evaluation of claimant’s condition at his request have stated that, for all practical purposes, there is none. A report of December 16, 1970, from Dr. Eoger S. Mitchell, M.D., to plaintiff’s counsel reads in pertinent part:
In my opinion this individual has completely normal pulmonary function for a person who has had a left *1076 upper lobectomy. In fact some people without a left upper lobectomy would have no better function than this gentleman has at the present time.
Having had proven tuberculosis he has a greater than average risk of relapse therefrom. However, he had 18 months of excellent chemotherapy plus a left upper lo-bectomy for the major disease residuals. I think his chance of relapse of tuberculosis in the future is minimal.
If he should be so unfortunate as to develop chronic bronchitis and/or emphysema, the fact that he has lost his left upper lobe would be an extra burden.
19. The several physicians evaluating claimant at his request praised the treatment of claimant in 1965 and 1966 as being highly appropriate and successful.
20. An administrative remedy was available to claimant in that he could have filed a claim under the so-called Military Claims Act, 10 U.S.C. § 2733, any time within the two year statute of limitations prescribed by that act, that time having expired on March 25,1967. However, the Department of the Air Force has no record of a claim having been filed.
21. Since 1968, the claimant has attempted to have a private relief bill enacted for his benefit. As a result of the claimant’s efforts to obtain legislative relief, the Air Force was called upon to investigate the matter of the alleged medical malpractice. A report of the facts of the case was made by the Air Force for an identical bill (S. 557) of the 91st Congress and incorporated in the report prepared by the Committee on the Judiciary to accompany S. Hes. 46.
22. (a) In conjunction with the investigation, radiologists in the Office of the Surgeon General of the Air Force reviewed the X-ray picture of January 16,1962, and determined that the picture showed slight abnormal changes in the apex of the left lung.
(b) They further reported that, if suspicion of the disease persisted, especially in light of the positive skin test, good medical practice would have required additional tests and the taking of more X-ray pictures before the disease could have been properly ruled out. However, they pointed out that the picture could not have been interpreted as indicating advanced tuberculosis, since the picture showed only a slight change from normal, which could have consisted of harmless scar tissue or a minor inflammation. The picture *1077 itself could not have indicated an unequivocal diagnosis of tuberculosis; it could have only raised the index of suspicion, according to the radiologists.
(c) Additionally, it was pointed out, there was no record of any subsequent complaint by the claimant from the time of the January 16,1962 N-ray until the discovery of advanced tuberculosis in March of 1965 which could have been attributed to the disease.
(d) Nevertheless, in view of the foregoing matters it was felt that: (1) the positive skin test, administered in 1962, indicated the presence of tuberculosis; (2) the X-ray picture taken on January 16,1962, was erroneously analyzed as being normal when, in fact, it was not; (3) in view of the positive skin test and the abnormal condition shown on the X-ray picture, further tests should have been administered; and (4) no such tests were administered.
(e) It was thus concluded that Air Force personnel had failed to sufficiently examine the claimant so as to conclusively establish, or rule out, the presence of tuberculosis and that in view of the claimant’s condition in 1965, it was possible that he was suffering from tuberculosis at the time of his medical examination in 1962.
(f) As a result, the Air Force went on record as admitting that it could not deny the probability of error on the part of the Air Force doctor.
23. On July 19,1972, and July 28, 1972, a physical examination was conducted by specialists in chest diseases at the National Jewish Hospital in Denver, at the request of the Department of Justice, as part of discovery proceedings in this case. These doctors indicate that further tests should have been run on the basis of claimant’s 1962 X-ray. Dr. Francis D. Cianciulli further states in pertinent part in the report:
* * * If these procedures had been followed through and the tuberculosis treated at that time, its subsequent clinical course could have been entirely avoided unless he did not follow proper medical therapy. With the proper treatment in 1962 the amount of disease would *1078 have been limited and subsequent surgery probably would not have been necessary.
It is difficult to evaluate his subjective complaint, but if true he would be given a Class II Functional Classification. (Class II states the [sic] he is able to walk with persons of his own age along the level for a distance of at least several blocks at a normal but not at a brisk pace. He is unable to keep up with persons of his own age when climbing up hills or stairs. He can climb one flight at a normal pace, but after two flights of steps at a normal pace he notices shortness of breath). He states this classification has been present since he was released from the hospital in January of 1966, and has not become progressively worse. Complete pulmonary function studies reveal a small amount of loss of lung volume which is compatible with the extent of pulmonary surgical procedure. In addition, he has a minimal amount of obstructive airway disease which could be related to his tuberculosis, but could also be related to his ten pack year smoking history or both.
Exercise studies were performed and reveal a small but significant drop in his arterial oxygen tension with exercise. This implies he does not have the normal capacity to respond to heavy exercise. On the basis of the entire evaluation, I would state that he has minimal but definite impairment in his exercise capacity both objectively and subjectively. Since his subjective complaints were not present until after his tuberculosis hospitalization, it is appropriate to state that it developed symptoms secondary to his tuberculosis illness and the related surgical treatment. After discussing with Hr. Davidson the entire clinical course, we feel that if his disease would have been properly treated in 1962, most of his current pulmonary impairment should have been avoided. I don’t think the amount of impairment he does have would preclude him from pursuing gainful employment. However, as he ages, and especially if he continues to smoke cigarettes, his symptomatology and/or pulmonary impairment may increase. At the present time this does not seem to be the case. * * *
24. (a) The above report, prepared by leading physicians in the field, concurs with the other physicians’ evaluations of plaintiff’s case. These doctors found not only that the 1962 X-ray film was suspicious and should have led to further studies, but that if claimant had received proper treatment in 1962, subsequent surgery would probably not have been necessary.
*1079 (b) Likewise, this most recent examination revealed that claimant has only a minimal amount of residual disability which does not deter him from pursuing gainful employment.
25. (a) In view of the fact that there are no conflicting medical opinions, the parties have agreed that it was negligence on the part of the Air Force doctor in 1962 to report claimant’s X-ray as “negative” without further studies, and that this act was the proximate cause of claimant’s hospitalization and surgery and slight residual disability.
(b) The parties have further agreed that plaintiff has no valid legal claim against the United States in view of the holding of the Tenth Circuit in 1967 (Finding of Fact 13), but that he has a valid equitable claim in the total amount of $27,000.00. The amount of $27,000.00 is broken down as follows: $7,350.00 is allocated for loss of earnings for 21 months[4] and $19,650.00 is allocated to the claims of pain and suffering and residual disability. The parties agree that in view of the fact that claimant’s slight residual disability may never trouble him, the above amount is a satisfactory equitable settlement.
CONCLUSIONS
1. The claimant, Michael D. Manemann, does not have any legal claim against the United States.
2. The claimant does have a valid equitable claim against the United States.
3. The amount of $27,000,00 is equitably due from the United States to the claimant.

The opinion, findings of fact and conclusions are submitted under tbe order of reference and tbe Rules of tbe Chief Commissioner.

 Claimant stated in his response: “Plaintiff [siel does not contend th.at he was confined for any period of time other than March 26, 1965 to April [sic] 17, 1966. Plaintiff [sic] does, however, contend that for approximately one year following his release from Fitzsimons Army Hospital he was unable to engage in any employment by reason of his weakened condition.”

 On March 23, 196.7, claimant filed a similar suit for the same injuries in the united States District Court for the District of Colorado which was dismissed for the same reasons by order dated August 7, 1967.

 S. Res. 46 referred the bill (S. 634) entitled “A bill for the relief of Michael D. M^anemann” to the Chief Commissioner of the Court of Claims for a report.

 The average of claimant’s earnings per month just before and after Ms claimed total disability, or $350.00 (paras. 11-12), multiplied by 21 equals $7,350.00.