The MERCHANTS NATIONAL
BANK OF MOBILE

v.

The UNITED STATES.

Cong. Ref. No. 1–80.

United States Claims Court.

Dec. 6, 1984.

As Corrected Dec. 17, 1984.

Before the Review Panel: THOMAS J. LYDON, Judge, Presiding, ROBERT J. YOCK and REGINALD W. GIBSON, JJ.

## REPORT OF REVIEW PANEL

In this congressional reference case,[1] the review panel is faced with defendant's challenge, on legal and factual grounds, to the Report and Opinion of the Hearing Officer which concluded that plaintiff, The Merchants National Bank Of Mobile (Merchants), has an equitable claim against the

---

1. S.Res. 291, 96th Cong., 1st Sess., passed by the United States Senate on November 27, 1979, referred to the Chief Commissioner of the United States Court of Claims S. 2052: "A bill for the relief of The Merchants National Bank Of Mobile." This reference was pursuant to 28 U.S.C. §§ 1492 and 2509 (1976). The Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, 42–43, effective October 1, 1982, amended 28 U.S.C. §§ 1492 and 2509 by replacing the designations "United States Court of Claims", "chief commissioner" and "trial commissioner" with the designations "United States Claims Court", "chief judge" and "hearing officer" respectively. These new designations will be used throughout this Report.

United States in the amount of $809,609 for losses Merchants sustained in lending money to a government contractor pursuant to two successive loan guarantee agreements with the United States.[2]

In substance, the reference required consideration of and a report on the question of whether payment to Merchants of $809,-609 "as compensation for losses sustained as a result of actions and conduct including, but not limited to misrepresentation, whether negligent or intentional, of the Defense Logistics Agency, and its fiscal agent the Federal Reserve Bank of Atlanta, during the period 1976—1978 concerning the cancellation of a Government loan guarantee and the subsequent issuance of a second loan guarantee on reduced term" would constitute payment of a legal or an equitable claim against the United States or represent the payment of a gratuity. The reference stated that consideration of this question was to take place "notwithstanding the bar * * * of sovereign immunity * * *."

On April 30, 1984, the hearing officer, after a trial on the merits, issued his Report and Opinion, containing his findings of fact and conclusions of law. The Report of the hearing officer, consisting of sixty-five pages, concluded that Merchants had an equitable claim against the United States for $809,609. While not clearly stated, *in haec verba*, in his Report, it is clear, and the parties do not dispute this point, that Merchants, the plaintiff herein, does not have a legal claim against the United States.

Plaintiff accepts the findings of fact and the conclusions of law set forth in the Report and Opinion of the hearing officer. Defendant has filed extensive exceptions to the findings of fact, and takes issue with the legal conclusions of the hearing officer. The matter has been fully briefed before the review panel, as it was before the hearing officer, and the parties have presented oral argument before the review panel.

The hearing officer set out his comprehensive findings of fact in narrative form in his Report and Opinion, followed by a discussion of legal issues and thereafter by a statement of his ultimate conclusions of law. The hearing officer's Report and Opinion is incorporated into this Report of the Review Panel for the sake of convenience and to avoid repetition. After careful review of the hearing officer's Report and Opinion, the record upon which it was based, and the lengthy and detailed submissions of the parties, the review panel concludes that the hearing officer's ultimate findings of fact are not clearly erroneous and are supported by the evidence of record and his ultimate conclusions of law are correct.

## I.

Only a summary sketch of the facts will be set forth herein. The detailed facts are set forth in the hearing officer's Report and Opinion.

This case involves four primary participants, namely Merchants, the plaintiff herein; Dri-Mix Products Corporation (Dri-Mix), the government contractor financed by Merchants; Defense Logistics Agency of the Department of Defense (DLA); and the Federal Reserve Bank of Atlanta (Fed).

Dri-Mix was founded in 1970, and grew steadily through 1975. It was awarded its first government contract in late 1970, and by the end of 1974, the principal source of Dri-Mix's business was government contracts. Dri-Mix's dealings with Merchants also began in 1970. From 1970–1975, Merchants was Dri-Mix's primary source of financing for government contracts. Generally, Merchants loaned money to Dri-Mix to finance initial contract performance and took back an assignment of contract proceeds as collateral. In 1975, Dri-Mix was awarded some nine government contracts having a total value of $1.7 million. Dri-Mix performed all its government contracts from 1970—1975 in a satisfactory manner.

2. The two agreements were identified as V-Loan Guarantee Agreement No. DLA–CFF–VL–1–77 (V-Loan I) and V-Loan Guarantee Agreement No. DLA–CFF–VL–2–77 (V-Loan II).

From 1971—1974, Dri-Mix's total debt to Merchants never exceeded $150,000. In 1975, however, its debt to Merchants increased significantly and caused concern to some officials at Merchants. As a result, Merchants took steps to reduce the amount of Dri-Mix's borrowing and to ensure that Merchants maintained a proper and secured position. For example, Merchants in consultation with Dri-Mix placed a $500,000 credit limitation on Dri-Mix.

In July 1976, Dri-Mix was awarded a large contract for the assembly of Meal, Combat, Individuals (MCI's) and accessories (essentially, successors to the well-known "C-Rations"). This contract required Dri-Mix to assemble various government-furnished materials (GFM) (*e.g.*, cans of meat, fruit, etc.) into individual meal units. The individual meal units were thereafter assembled into cases, and, eventually into larger units for shipping purposes. A second related contract required Dri-Mix to supply a cocoa beverage mix that was to be incorporated into the MCI's, and a third related contract required Dri-Mix to supply "accessory pouches" to be incorporated into the MCI's.

Substantial problems and delays developed with regard to the shipment of GFM by the DLA. The MCI contract required the DLA to supply 20 percent of each component to be incorporated into the MCI's, at certain set intervals. This essential contract plan was to permit Dri-Mix to place the various components in an efficient manner around the assembly lines so that finished units would flow off the end of the assembly line. After each portion of the GFM was assembled into MCI's and delivered, Dri-Mix was to be paid for that segment. The contract, as Dri-Mix planned to perform it, would thus become self-financing from contract payments after the initial start-up costs were incurred. Dri-Mix had estimated its start-up costs to be approximately $200,000—$300,000. Merchants was to be Dri-Mix's primary source of financing in this regard.

However, DLA failed to deliver the GFM in the timely and orderly manner contemplated in the MCI contract. Dri-Mix received all or nearly all of most components, but experienced substantial delays with the meat components. Without the meat components, Dri-Mix could not even begin production and assembly of the units. Consequently, the delivery dates for the contract had to be amended and extended on several occasions. Dri-Mix was not at fault for these delays in the furnishing of the components by the DLA.

Meanwhile, Dri-Mix was also forced to expend large sums for extra warehouse space, demurrage charges, and labor costs because the government had breached the MCI contract by failing to deliver the components (GFM) in a timely and orderly manner, and by oversupplying components which could not be assembled. Moreover, while Dri-Mix was incurring these unanticipated expenditures, it was not receiving any contract progress payments from the government because it could not produce any complete MCI units. The resulting cost escalation, and the absence of any cash flow, eventually outstripped both Dri-Mix's estimated start-up costs and its available line of credit.

Merchants advised Dri-Mix that it would extend no credit beyond the $500,000 limitation. Dri-Mix, after rejecting a progress payment option as inadequate under the circumstances, then sought a government-guaranteed V-Loan to obtain additional operating capital through Merchants. Merchants filed an application for the V-Loan (hereinafter known as V-Loan I) with the Fed, as required. Merchants did this in order to provide additional financing without overextending itself. Assurances provided by the government that the requisite guarantees would be forthcoming encouraged Merchants to continue financing Dri-Mix during the V-Loan application process. It is clear that most of this additional financing was necessitated by the delivery problems cited above. Therefore, though indirectly, Merchants' initial financial exposure reasonably can be attributed to government fault. The loan guarantee was subsequently approved by the DLA,

4

also as required. The Fed, acting as the DLA's fiscal agent, then entered into the V-Loan I agreement with Merchants.

When almost the entire amended V-Loan I amount ($1,584,000) had been advanced by Merchants, DLA revoked the loan guarantee. The DLA reversed its initial interpretation of the applicable statute and decided that it did not have authority to enter into V-Loan I. Merchants officials were shocked by this sudden turn of events which left Merchants without any guarantee for the money it had already loaned Dri-Mix to perform the MCI government contracts. The hearing officer found that DLA and the Fed negligently granted a V-Loan guarantee to Merchants and subsequently cancelled the same when it discovered it had no authority to grant one initially. This negligent misrepresentation of its authority and the previous assurances regarding this authority caused Merchants to extend substantially more unguaranteed credit than it would have absent the apparent guarantee. Clearly, the government was at fault in this regard and this wrongdoing was responsible in some measure for the losses, here at issue, suffered by Merchants who was not at fault.

The facts make it clear that this instance was Merchants' first exposure to a V-Loan. It is evident that Merchants acted prudently in applying for the loan to ensure that its credit extensions would be guaranteed. Both the Fed and DLA gave assurances that such guarantees could be issued and indeed issued the V-Loan guarantee. The panel concludes from the findings and the record that Merchants was not at fault in ascertaining the government's authority to issue such guarantees.

DLA told Merchants that the only way to remedy the situation was through an amendment to the 1978 Defense Appropriations Act, earmarking money specifically for V-Loans. DLA provided the language for the necessary appropriations bill, and promised to "stand by" Merchants and to do all it could to help out. Merchants was concurrently being advised by DLA that there was a severe shortage of MCI's and

that the Armed Services were in urgent need of them worldwide. Merchants, moved by the appeals to "patriotic duty," decided to cooperate with DLA by continuing to finance Dri-Mix, until the necessary loan guarantee could be authorized and re-issued. The government was aware that Merchants was continuing to finance Dri-Mix in the interim. DLA estimated that $2—$3 million would be necessary to complete the MCI contracts. This evidences that the government knew the second V-Loan guarantee would have to be larger than V-Loan I. It is apparent that based on the assurances made by the government, the bank continued to finance Dri-Mix expecting such a larger loan guarantee. Loans made during this interim period comprise some of the losses suffered by Merchants. The Panel concludes that the fault in this situation lies with the government, and, in an equitable sense, such fault is sufficient to justify an equitable claim against the government in a congressional reference context.

Congress thereafter appropriated $5 million for V-Loans. Merchants applied for a new V-Loan, expecting DLA to stand by its prior assurances. By this time, however, Dri-Mix had produced a substantial quantity of MCI's, and DLA no longer had an urgent need for them. Merchants applied for a new V-Loan (V-Loan II) in the amount of 85 percent of $2.6 million, as compared to 85 percent of $1.6 million received under the invalid amended V-Loan I. The increase in requested guarantees was substantially due to the increased financing extended by Merchants to Dri-Mix based on the assurances of DLA that a new valid guarantee was forthcoming. However, despite the $5 million appropriated and prior DLA assurances of subsequent guarantees upon which Merchants relied in extending additional financing to Dri-Mix, DLA refused this requested guarantee. DLA would only guarantee $1.1 million (55 percent of $2 million). Hard bargaining ensued, and Merchants accepted a "take it or leave it" offer. Although by that time a larger guarantee was needed due to interim financing, the V-Loan II guarantee was less

than the original guarantee and fell far short of Merchants needs of which DLA was aware. Furthermore, as a condition to issuing it, DLA also required Merchants to advance to Dri-Mix an additional $500,000 in an unguaranteed line of revolving credit. Despite DLA's knowledge of the loan extensions plaintiff had made, despite the $5 million appropriation, and despite the assurances made by the DLA upon which Merchants relied, the government refused to give the guarantee it knew Merchants needed. Defendant claims that it based its decision to limit the guarantee on the fact that plaintiff had maladministered V-Loan I. Administration concerns were not raised by defendant prior to this time perhaps indicating hindsight efforts on the part of the government to justify its decision to provide a limited guarantee. Moreover, the hearing officer made definite findings that plaintiff administered V-Loan I properly. The review panel does not find said conclusions clearly erroneous. Therefore, defendant's primary reason for limiting the V-Loan II guarantee was unjustified. Such a decision to limit the guarantee under V-Loan II to the extent defendant would provide made subsequent to its assurances and with the government's knowledge of the loan extensions already made constitutes wrongful governmental action in an equitable context.

In early 1978, after failing to acquire sufficient loan guarantees to finance Dri-Mix properly, Merchants became concerned with Dri-Mix's ability to meet its payroll. Thus Merchants was compelled to take steps to protect itself in case of Dri-Mix's bankruptcy so as to avoid further losses. Merchants requested that the DLA increase the V-Loan guarantees but it refused. Merchants then decided to cease extensions of credit absent further guarantees. DLA in refusing to increase the V-Loan guarantees was well aware that Dri-Mix could not continue contract performance without financial help from Merchants. DLA's indifference to Merchants' plight under the circumstances is deemed inequitable.

Subsequently, Dri-Mix was unable to meet its payroll and filed for Chapter 11 reorganization. Merchants attempted to work with DLA in order to continue Dri-Mix's MCI production. DLA, however, refused to cooperate because its officials felt that they had received what they needed from the contractor and sought to minimize DLA losses. Dri-Mix was forced to file in bankruptcy for liquidation. DLA terminated the Dri-Mix contracts for default, although it expected that the default termination would be converted to a termination for the convenience of the government because of the delay and disruption caused by its breach in failing to furnish GFM in a timely and orderly manner. The trustee in bankruptcy for Dri-Mix sued to have the termination changed to a termination for convenience and for damages, and DLA counterclaimed for damages. The trustee in bankruptcy eventually settled Dri-Mix's claim against the government for $1.7 million. Based on these facts, Merchants now seeks equitable relief to recover for some of the losses it incurred in funding Dri-Mix's MCI contracts.

In substance, the hearing officer found a number of government wrongs which gave rise to the losses for which plaintiff seeks recovery under the reference now under consideration. First, the hearing officer found that DLA's breach of the MCI contracts exacerbated Dri-Mix's financial situation such that Dri-Mix would not have been able to continue contract performance without financial help from Merchants. Merchants agreed to continue to finance Dri-Mix's performance of these government contracts. The performance of these contracts at this critical period was urgently required by DLA to meet a worldwide shortage of MCI's. On the strength of receiving a government-guaranteed V-Loan, which would serve to protect it from possible losses, Merchants agreed to continue to make loans to Dri-Mix.

Second, having received the government-guaranteed V-Loan I and after having loaned Dri-Mix almost the entire amount of V-Loan I, said guarantee was cancelled by DLA on the ground DLA had misinterpret-

ed the applicable statute. Realizing that its actions had placed Merchants in an unprotected position, DLA advised that it would do all it could to seek additional appropriation authority for another V-Loan guarantee for Merchants. DLA advised Merchants of its continuing, urgent need for the MCI's to meet worldwide shortages and promised to "stand by" Merchants and do all it could to help out if only Merchants stood by Dri-Mix and continued to provide financing for continued MCI contract performance. Accordingly, during the period following cancellation of the V-Loan I guarantee, Merchants continued to loan money to Dri-Mix for MCI contract performance on the strength of DLA assurances that a substitute V-Loan guarantee would most probably be authorized and issued to it and on the appeal of DLA that the contract items in question, the MCI's were urgently needed, which appeal reached Merchants patriotic nerve. Merchants relied, in making these loans, on the belief that the assurances and appeals by DLA were made in a good faith effort to protect Merchants' creditor position.

Third, having received appropriated authorization to issue V-Loan II, DLA, although authorized to guarantee a larger loan amount, only offered Merchants, on a "take it or leave it" basis, a loan guarantee of $1,100,000, which was smaller than the original V-Loan I DLA had revoked. Further DLA required, as a condition to issuing any loan guarantee, that Merchants advance an additional $500,000 to Dri-Mix in an unguaranteed line of revolving credit. Congress had appropriated some $5 million for V-Loans. Merchants had applied for a new V-Loan guarantee in the amount of 85 percent of $2.6 million, or $2,210,000, an amount consistent with the assured understanding Merchants had reached with DLA earlier. DLA refused to stand by its earlier assurances because it claimed maladministration of the cancelled V-Loan I by Merchants, a charge not supported by the record in this case. However, the hearing officer found that at the time DLA was negotiating V-Loan II terms, conditions and amount with Merchants, DLA's need

for MCI's was not as great as was the case previously. This lack of compelling need for the MCI's suggested to the hearing officer that fact influenced DLA's dealings with plaintiff and manifested a lack of good faith in such dealings.

This position by DLA placed Merchants between a rock and a hard place. If Merchants refused the terms and conditions which DLA placed on it and thus was denied V-Loan II, there would have been immediate cessation of production since Merchants rightly would have refused to continue to fund Dri-Mix and thereby increase its losses, there would have been the immediate bankruptcy of Dri-Mix, and Dri-Mix would have defaulted on the loans previously made to it by Merchants. On the other hand, the scaled-down V-Loan II with its conditions, was just sufficient to permit continued procurement of additional MCI's for a period of time, but was clearly insufficient to protect Dri-Mix from bankruptcy and Merchants from losses on its loans due to payment default by Dri-Mix. DLA's refusal to replace V-Loan I with an adequate V-Loan II, as it assured Merchants it would during the interim period between V-Loans I and II, and after congressional authorization allowed it to do so, contributed substantially to the losses Merchants suffered in funding Dri-Mix's performance of the MCI contracts. Had V-Loan II been issued in the amount initially within the understanding of both parties, this reference might not have been necessary.

As a result of these actions by DLA, which were responsible in a significant way for the losses which Merchants incurred in funding Dri-Mix's performance of the MCI contracts, part of which are the subject of this reference, the hearing officer detailed why he believed such actions were wrongful and/or negligent under the circumstances and thus justified the equitable award he recommended. The hearing officer found that Merchants was in no way responsible for the losses it suffered, having acted at all times in a prudent and cautious manner relative to its loan dealings with Dri-Mix.

## II.

The facts are critical in this reference. Recognizing this fact, defendant has taken some 76 exceptions to the hearing officer's findings. The Rules of the Claims Court provide that "[t]he hearing officer's findings shall not be set aside unless clearly erroneous. * * *" RUSCC Appendix D ¶ 8. This "clearly erroneous" standard of review was defined in pertinent part in *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) as follows: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This definition has received general acceptance. *See Milmark Services, Inc. v. United States,* 731 F.2d 855, 857 (Fed.Cir.1984) (quoting *United States v. United States Gypsum Co., supra*); *United States v. Oregon Med. Soc.,* 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952) (quoting *United States v. United States Gypsum Co., supra*).

The review panel has given careful consideration to each of the exceptions to the hearing officer's findings set forth by defendant in its submissions. Taken as a whole or individually, these exceptions do not pass the muster of the clearly erroneous standard of review which the panel must follow. It is not enough that the review panel would have reached different factual conclusions had the decision been ours to make initially. *See Nickerson v. Commissioner,* 700 F.2d 402, 405 (7th Cir. 1983). Further, the review panel gives great weight to the findings made by the hearing officer and the inferences he drew from the evidence of record. *See North River Energy Corp. v. United Mine Workers,* 664 F.2d 1184, 1189 (11th Cir.1981).

The burden is on defendant to prove that the hearing officer's findings of fact are clearly erroneous. *See* 9 Wright & Miller, *Federal Practice and Procedure* § 2585 at 729 (1971). Due regard must be given by the review panel to the opportunity of the hearing officer to judge the credibility of the witnesses. *Id.* at 732. Defendant has failed to carry that burden in this case. Further, in its review of the record, the panel must take that view of the evidence and the inferences deducible therefrom in a light which is most favorable to plaintiff. *Aunt Mid, Inc. v. Fjell—Oranje Lines,* 458 F.2d 712, 718 (7th Cir.1972), *cert. denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131.

The parties in their submissions and oral argument devoted considerable discussion to the question of whether the record adequately supports the findings of the hearing officer. Each party cites the record extensively in support of their positions. The fact that each can find comfort and support in some part of the record indicates the conflicting and inferential nature of the evidence. In such circumstances, the hearing officer performed his duty in resolving this conflicting evidence and drawing the inferences flowing therefrom. This is what he is supposed to do.

On review of the record in this case, the panel concludes that the findings of fact of the hearing officer, except in limited and harmless error instances, have adequate evidentiary support.[4] *See generally* 9

---

4. Many of defendant's exceptions, even if accepted as well taken, would not be of any moment since they do not impact significantly on the hearing officer's final determination one way or another. For example:

In one exception, defendant asserts that the hearing officer's finding that Dri-Mix's credit balance on July 19, 1976, was $200,000 is erroneous (p. 11 n. 5). Even if this assertion is deemed correct, it is, at best, harmless error. Defendant claims the correct figure is $400,000. However, assuming the $400,000 figure is accurate, it still lies within the fluctuation range $80,000—$505,000 set out by the hearing officer in the text on page 11 of his Report to which the footnote in question is directed, thus minimizing the significance of any error, assuming one exists.

In another exception, defendant points out that the hearing officer attributed a particular report concerning the meeting at which Karl Kabeiseman advised Merchants of the invalidity of V-Loan I to Peter Tovar (p. 20). In fact the report was prepared by Major C. Glen Shaffer. Such an error is harmless and in no way detracted from the hearing officer's ability to give the report whatever weight he felt it deserved.

Wright & Miller, *Federal Practice and Procedure*, § 2585 (1971). The review panel, upon consideration of the total record and the determination of the hearing officer, is not left with a "definite and firm conviction that a mistake has been made" relative to said determination.

■ One of defendant's primary assertions is that the plaintiff's own negligence contributed to its losses and thus it should not be compensated for its losses. In this way, defendant seeks to neutralize the impact of the wrongful actions of the DLA in this matter. There is support for defendant's position in this Congressional Reference context. *See O'Donnell v. United States*, 166 Ct.Cl. 107 (1964). In *O'Donnell*, a Congressional reference case, the government argued that the plaintiff was as much at fault as was the government relative to losses the plaintiff incurred in shipping potatoes to Sweden. The court agreed with the government stating:

> Having balanced defendant's acts of negligence, which are the basis of the equitable claim before us, against plaintiff's failure to exercise due care in the conduct of their business, we reach the con-

clusion that the latter clearly outweighs the former. *Id.* at 118.

As a result of this factual conclusion the court determined that the plaintiff had neither a legal nor an equitable claim against the government. *Id.* at 119.

In reviewing the factual setting in this case, the review panel concludes that the hearing officer's findings that plaintiff acted in a conservative and prudent manner under the circumstances of this case are supported by the record and are not clearly erroneous.[5] Therefore, given these factual conclusions, the rule in the *O'Donnell* case does not apply and plaintiff's own actions do not preclude a determination that Merchants has an equitable claim against the government.

### III.

■ It is established that conclusions of law by the hearing officer are not protected by the clearly erroneous standard. *See* 9 Wright & Miller, *Federal Practice and Procedure*, § 2585, at 732 (1971). It is not unreasonable to view the relationship of the hearing officer to the review panel as comparable to that between a district

---

Exceptions directed at harmless error findings in no way impact on the conclusions of the hearing officer or on the outcome of this case. *See Sanders v. United States*, 219 Ct.Cl. 285, 310, 594 F.2d 804, 818 (1979). Such harmless errors are not sufficient to disturb the hearing officer's ultimate factual conclusions. *See* RUSCC 61.

5. Two examples of plaintiff's negligence as asserted by the government which are contrary to the hearing officer's findings are helpful in illustrating this point.

First, defendant alleges that plaintiff was negligent in that some of its officers failed to heed the warnings of other bank personnel regarding the extension of loans to Dri-Mix to finance the MCI-related contracts. To the contrary, the hearing officer concluded that plaintiff took a number of steps to maintain a proper and secured position. *See* Rep. 7. Additionally, the record indicates that, though concerns were expressed about the loans, bank officials discussed these concerns and concluded that the bank's security was adequate. In Merchants' best judgment, this security combined with the past successful track record of Dri-Mix made the loans a prudent investment.

Second, defendant asserts that plaintiff loaned approximately $830,000 to Dri-Mix, despite its

$500,000 credit limitation, before V-Loan I was approved. The hearing officer did not find the plaintiff negligent in making these extensions prior to approval. Instead the hearing officer concluded that this financing would not have been advanced without assurances from defendant that the V-Loan would be approved. The record is replete with evidence of such assurances.

While some government officials in their testimony deny making such assurances, the hearing officer was not persuaded by said denials. One of the reasons for utilizing the clearly erroneous standard of review, and the deference to the hearing officer inherent therein, is the hearing officer's opportunity to hear the testimony of the witnesses, relied on heavily by both sides, and to ascertain the credibility of the respective witnesses. In this instance, the hearing officer concluded from the record that the assurances were given and were acted on by Merchants to its detriment. The hearing officer did not consider the loan extensions in question by Merchants under the circumstances negligent acts and the review panel has found no basis in the record to set aside his findings in this regard.

court judge and a court of appeals. *See Datronics Eng'rs., Inc. v. United States*, 210 Ct.Cl. 665, 671 (1976). The standard of review applicable to legal questions employed by courts of appeal when reviewing district court decisions is one of *de novo* review. *See United States v. McConney*, 728 F.2d 1195, 1201–03 (9th Cir.1984). *See also United States v. General Motors Corp.*, 384 U.S. 127, 141 n. 16, 86 S.Ct. 1321, 1328 n. 16, 16 L.Ed.2d 415 (1966). The *de novo* standard of review will govern the consideration of legal issues by the review panel in this case. Accordingly, no deference need be given the legal conclusions reached by the hearing officer. *See* 9 Wright & Miller, *Federal Practice and Procedure*, § 2588 (1971).

Defendant attacks the hearing officer's view of the concept of an "equitable claim" in a Congressional reference case as embodying a broad moral concept which is not dependent on government fault in some degree for its application. While the review panel agrees with defendant that the hearing officer's view of the equitable claim concept is erroneous as a matter of law [6], it does not serve to advance defendant's position in this case. This is so because the hearing officer's discussion of the matter is pure dicta. Having concluded that the government's wrongful actions were responsible for the losses for which Merchants seeks recovery in this reference case, it was totally unnecessary for the hearing officer to rely on this concept as a basis for his ultimate determination and to engage in needless discussion of it.

■ Defendant seeks to shield some of its wrongdoing, *i.e.*, assuring Merchants that financing Dri-Mix's MCI contracts would be protected by guarantees (V-Loan I) that DLA belatedly concluded it lacked authority to grant although Merchants relied on these assurances and the apparent authority of DLA and the Fed to grant such guarantees, by advancing the well-known principle that one deals with government officials who lack authority to act at ones peril. *See Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). While this principle is an effective and salutary shield against legal claims, it is and should be less of a shield against an equitable claim in a proper case. In this particular case, as pointed out earlier, the reference stated that this case was to proceed "notwithstanding the * * * bar of sovereign immunity * * *" which includes, reasonably read, the lack of authority defense espoused in the *Federal Crop Insurance* case, *supra*. Moreover, the apparent authority of governmental officials, DLA and the Fed, operating in areas of their exper-

---

**6.** The review panel recognizes that there is some difference of opinion within the Claims Court regarding the concept of an equitable claim in congressional reference cases. *See* Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective*, 25 Amer.U.Law Rev. 595 (1976). *Burkhardt v. United States*, 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949) is the seminal case for the no fault broad moral approach advocated by the hearing officer herein whereas *B Amusement Co. v. United States*, 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960) constitutes the foundation for the opposite view that government wrong or fault must underscore an equitable claim in a reference case. This particular review panel believes the latter view is the correct one. For support of this latter view see *Shane v. United States*, 3 Cl.Ct. 294, 304 (1983); *The Innocent Victims of the Occupation of Wounded Knee, South Dakota v. United States*, Cong.Ref. No. 4–76, slip op. at 31–36 (June 10, 1981) adopted by the Review Panel on December 15, 1981 (synopsis at 229 Ct.Cl. 465); *ISC Metals, Inc. v. United States*, Cong.Ref. No. 6–72 (August 18, 1978) adopted by the Review Panel on February 11, 1980; *Arizona Insurance and Investment Co. v. United States*, Cong.Ref. No. 1–72, slip op. at 18 (Oct. 29, 1977) adopted by the Review Panel on May 29, 1979; *Wong v. United States*, Cong.Ref. No. 3–74, slip op. at 12–13 (November 23, 1977) reversed on other grounds by the Review Panel on May 16, 1979 (synopsis at 220 Ct.Cl. 750); *Fass v. United States*, Cong.Ref. No. 1–76, slip op. at 18 (Jan. 5, 1978) adopted by the Review Panel on May 28, 1978 (synopsis at 217 Ct.Cl. 743); *Oliver v. United States*, Cong.Ref. No. 4–72, slip op. at 17 (April 8, 1976) adopted by Review Panel on January 10, 1978 (synopsis at 217 Ct.Cl. 742); *Manemann v. United States*, 202 Ct.Cl. 1068 (1973). *But see Amick v. United States*, 5 Cl.Ct. 426, 430–31 (1984).

tise and authority,[7] in the circumstances of this reference, supports the conclusion that lack of authority, if it is deemed a viable principle, should not preclude or reduce in any way the granting of equitable relief in this case.

Defendant's *in terrorem* argument that failure to adhere to the lack of authority principle, *supra*, would open up the flood gates to all sorts of lack of authority situations is not appealing in this case. The simple answer is that this congressional reference case is *sui genesis*. It rests on its unique and particular facts. There may well be a reference case in which lack of authority may properly serve to require rejection of an equitable claim, but this is not one of them.

Defendant's final legal argument has two prongs to it. By this argument, defendant seeks to insulate itself from its faulty actions relative to V-Loan I and thus reduce the amount that would otherwise be awarded Merchants under this reference. First defendant argues that V-Loan II constitutes a "substitute" contract and thus discharges the government's obligations as well as absolve it of fault relative to V-Loan I. Second, defendant argues that Merchants was not damaged by the "substitution" of V-Loan II for V-Loan I.

Defendant first argues that V-Loan II was intended as a substitute contract for V-Loan I. Such a substitution, if deemed a true substitute contract situation, would extinguish all of the government's obligations under V-Loan I. The *Restatement on the Law, Contracts* 2d § 279 (1981) describes a substituted contract as follows:

(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.

(2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

From this description, the court concludes that V-Loan II is not a substituted contract. It is undisputed in this case that V-Loan I was invalid. Therefore, there was no initial contract or contractual duty for which to substitute.

Furthermore, the context in which a substituted contract is raised as an issue is generally one in which the second contract is breached and the obligee attempts to enforce the original contract. Again, in this case both parties concede V-Loan I was unauthorized and thus invalid. Plaintiff, therefore, does not base its equitable claim upon enforcement of V-Loan I. Plaintiff instead bases its equitable claim upon a series of wrongful acts committed by the government, each of which contributed to the plaintiff's losses. Therefore, a theory based upon a substituted contract is not applicable in this case.

The defendant appears to take the substituted contract argument one step further by implying that V-Loan II precludes plaintiff from asserting the above-mentioned wrongful acts by the government surrounding V-Loan I which contributed to plaintiff's losses. The court concludes that this argument is without merit and *United Nations Korean R.A. v. Glass Production Methods*, 291 F.2d 168 (2d Cir.1961), relied upon by defendant, supports this conclusion. In *United Nations Korean, R.A.*, a substitute contract was entered into (the previous contract was thought to be invalid but it was not). The court concluded that the original contract could no longer be

---

7. The question of whether DLA and the Fed had authority to issue V-Loan I was a very close question of statutory construction according to defendant. Further, it resulted, in some part, from the failure of DLA to conform their regulations when a statutory change occurred. Since the interpretation and construction by the DLA and the Fed relative to issuance of V-Loan I was so close a question, it seems inequitable to penalize Merchants because it suffered loan losses relying on the assurances and entreaties of DLA to continue making loans to Dri-Mix because the protection of V-Loan I was forthcoming. Further, since the question of authority was so close, it would be unreasonable in an equitable context to bushwhack Merchants, with the legal defense, of divining lack of authority under the circumstances. The fault under these circumstances properly rests with the DLA and the Fed.

enforced. However, the plaintiff also had a claim against the defendant based on misrepresentation concerning the first contract. The court found that this claim was not cut off by the substituted contract. *Id.* at 173. Defendant similarly wants to cut off claims associated with governmental wrongful acts surrounding V-Loan I. However, the rule in *United Nations Korean R.A.* precludes such an extinguishment of claims absent consideration. *Id.*

Additionally, the review panel concurs with the hearing officer's findings that it was not the intent of the parties to cut off any claims based on wrongful acts committed by the government regarding V-Loan I. Certainly DLA personnel had no such intent as evidenced by the testimony of one of its officials (Mr. Hillin), who negotiated V-Loan II with Merchants. As to whether said claims were cut off, he testified in response to an inquiry about whether the "bank's concerns about the so-called cancellation of V-Loan I had * * * been put to rest: * * * I don't think anybody, at least, certainly, not me, believed that anything would come to rest if the contract wasn't completed and the bank didn't get its money back. Somehow or other it would come back up * * *." (Tr. 1757). Clearly, there was no intent to cut off any claim based on wrongful acts. In fact, at that point in time an equitable claim clearly was not envisioned by either party. Even if the parties may have contemplated a subsequent attempt by Merchants to enforce V-Loan I as a legal claim and intended to preclude such an action, this equitable claim is not such an attempt. Thus the requisite intent necessary as part of the second V-Loan agreement to preclude this equitable claim was not present.

Further evidence that plaintiff did not intend to give up an equitable claim based on the government's fault surrounding the cancellation of V-Loan I can be found in the general reservation of rights in Merchants' November 28, 1978, letter to the Fed. This broad reservation clearly reserved all rights of Merchants concerning V-Loan I. Returning to the premise that Merchants' equitable claim is based on a series of wrongful acts by the government which caused damages to Merchants, this reservation adds weight to the thrust of Merchants' right to relief on the basis of the government's fault in cancelling V-Loan I.

The above reservation of rights combined with the reservation in the next paragraph of the November 28, 1978, letter concerning V-Loan II makes it clear Merchants in no way intended that payment by the government of the guarantee under V-Loan II would release the government from any further equitable liability to Merchants for governmental wrongs attendant to V-Loan I.

Defendant, under its second argument, claims that plaintiff was not damaged by the substitution of V-Loan II for V-Loan I. In making this assertion, defendant focuses only on the terms of V-Loan II. It asserts that the terms were actually more favorable than V-Loan I, given potential outcomes of Dri-Mix's performance of the contracts. The review panel rejects this argument for the following reasons: First, the review panel previously addressed the governmental actions surrounding V-Loan II and pointed out how the DLA poorly used Merchants. Defendant's argument ignores the damages resulting therefrom. Second, defendant's argument, like that asserting the substituted contract theory, fails to address the series of governmental wrongful acts to determine whether damages were caused thereby. Finally, this argument does not focus on the actual financial impact on Merchants after this series of wrongful acts and Dri-Mix's default.

The hearing officer's findings concerning damages are not as detailed as they might have been, but, after a review of the record and upon consideration of the parties' oral arguments, the review panel finds that the hearing officer's ultimate conclusion concerning damages has support in the record and is not clearly erroneous. The evidentiary submissions indicate that plaintiff loaned Dri-Mix a total of $2,345,383.46 for the MCI related contracts. When Dri-Mix

defaulted on these loans and entered into bankruptcy proceedings plaintiff received the $1.1 million guaranteed portion of V-Loan II from defendant. Plaintiff also received $317,500 in a compromise agreement with the bankruptcy trustee. Plaintiff applied $290,820.26 of this figure to the unguaranteed portion of V-Loan II. Subtracting what plaintiff has already received to cover its loan extensions, $954,563.20 remains (or $927,883.46 if the full $317,000 is utilized). This loss figure exceeds plaintiff's claim for $809,609 set out in S. 2052.

The hearing officer refused to award more than the amount ($809,609) initially requested from Congress. He stated that any award in excess of that amount should be determined by Congress given the court's decision that an equitable claim does exist. The Review Panel finds that the record adequately supports a recommended award in the amount of $809,609. Though plaintiff's claimed losses before this court do exceed its initial claim request, the review panel concurs with the hearing officer's decision to limit the award to amount specified in the reference. It is noted that plaintiff's counsel during oral argument conceded that plaintiff was now only claiming $809,609 in this reference and would absorb any additional losses arising from the loans in question.

After reviewing the record and defendant's position on the issue of damages, the review panel finds no basis for declaring the hearing officer's conclusions concerning damages clearly erroneous. First, the DLA's failure to coordinate deliveries of GFM to Dri-Mix necessitated Merchants lending more money than anticipated. Second, Merchants extended more credit than its limits permitted based on its belief that it was, or would be, secured by government guarantees. And finally, the default of Dri-Mix precipitated by the DLA's failure to guarantee the necessary financing despite its authorization to do so and its initial assurances that it would do so. The record includes a listing of plaintiff's financial losses. The hearing officer concluded that these losses were caused by the government's wrongful acts (Rep. 59). The

defendant has failed to demonstrate to the review panel that such findings and conclusions are clearly erroneous.

Finally, defendant contends that, in any event, the money loaned between V-Loan I and V-Loan II should not be part of any damage recommendation. Because no guarantee agreement existed for these loans, defendant argues they should not be considered as part of any relief recommended herein. Defendant relies on the testimony of one of Merchants' attorneys who testified that DLA officials told Merchants that V-Loan II would not be automatic and that the bank would have to file a new application. Defendant reasons that if the new V-Loan was not considered automatic, there was no assurance that the new V-Loan would be larger than the first. Without such assurances, defendant argues, the advances made prior to V-Loan II cannot be considered guaranteed or contemplated as being guaranteed and thus should not be deemed part of any damage recommendation.

The review panel, based on the totality of the record, concludes that the hearing officer's findings that the advances in question were based on assurances made by DLA are not clearly erroneous. It is evident that the government made assurances that it would remedy the V-Loan problem and that Merchants should continue to finance Dri-Mix. The government was also aware of Merchants' continued financing of Dri-Mix. This evidence minimizes the importance of the fact that the DLA told plaintiff the V-Loan was not automatic. Such a statement combined with the assurances made before and after said statement was made could be interpreted as meaning Merchants could not rely on its prior V-Loan application. It does not necessarily indicate the probability that no new V-Loan would be forthcoming. Moreover, in an equitable context, the assurances that DLA would stand by Merchants if it continued to finance Dri-Mix during the processing of the V-Loan II application overrides any nuances defendant seeks to draw from its observation to Merchants that award of

V-Loan II should not be viewed as completely automatic since Congress had to approve funding for new V-Loans and something totally unexpected could happen in the halls of Congress. Thus the loan advances in the interim between the two V-Loans should be included in the damages caused by the government's series of wrongful acts.

### IV.

As a result of the above discussion, the review panel recommends that the Chief Judge, in the transmittal of this Report of the Review Panel, as well as the Report and Opinion of the hearing officer, to the United States Senate as required by S.Res. 291, advise the Congress that the plaintiff, The Merchants National Bank of Mobile, does not have a legal claim against the government, but does have an equitable claim against the government for $809,609, and that the payment of said sum to plaintiff would not constitute a gratuity.[8]

---

[8] After a review of the bankruptcy settlement agreement entered into by and between plaintiff, the trustee in bankruptcy and defendant, the review panel concludes that a recovery of $809,609 in this case will preclude any further recovery in the bankruptcy court. Counsel for both parties conceded during oral argument that such a recovery in this case would indeed cut off any additional relief for plaintiff in the bankruptcy proceedings. Neither party raised any concern about this bankruptcy settlement agreement either during trial, in their briefs, or at the oral argument before the review panel.