ESTATE OF Dr. Beatrice
BRAUDE, Plaintiff,

v.

UNITED STATES, Defendant.

Congressional Reference No. 93–645X.

United States Court of Federal Claims.

June 23, 1997.

Weinstein, J., filed dissenting opinion.

Before the Review Panel: MARIAN BLANK HORN, Judge, Presiding Officer, and WILKES C. ROBINSON, Judge, Member of Panel.

## REPORT OF THE REVIEW PANEL

The above-captioned Congressional Reference case (No. 93–645X) is before the review panel, pursuant to 28 U.S.C. §§ 1492 and 2509 (1994), following the issuance of the Hearing Officer's "Opinion," *Estate of Beatrice Braude v. United States,* 35 Fed.Cl. 99 (1996), issued March 7, 1996, and the "Hearing Officer's Report," issued June 3, 1996, on a Congressional Reference action (Private Bill S.840 (1993)) referred to the court.

The Hearing Officer appointed by this court, pursuant to 28 U.S.C. § 2509, is assigned the responsibility to determine the facts underlying the referred claim and then "to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c). The review panel then has the responsibility, by majority vote, to "adopt or modify the findings or the conclusions of the hearing officer." 28 U.S.C. § 2509(d). Appendix D, paragraph 10, of the Rules of the United States Court of Federal Claims (RCFC), similarly states: "On the basis of the entire record, the panel, by a majority vote, shall adopt or modify the findings or the conclusions of the hearing officer and shall file its report with the Clerk for service on the parties." After carefully reviewing the record in the above-captioned case, the review panel, which was convened pursuant to 28 U.S.C. § 2509, issues its majority and minority reports.

RCFC Appendix D, paragraph 8 states that "the Hearing Officer's findings shall not be set aside unless clearly erroneous...." The events at issue in the above-captioned case occurred more than forty years ago and were not easy for the Hearing Officer to reconstruct. Moreover, the record developed by the parties in the case was not a model record on which to reach a decision. Although the Hearing Officer offered the defendant opportunities to defend against the allegations made by the plaintiff, after losing a motion to exclude certain evidence due to its failure to raise timely evidentiary objections, the defendant chose to allow the record to develop without its active participation. The defendant presented no witnesses in support of its position and finally stipulated to damages in the amount of $200,000.00.

The Hearing Officer's final opinion and report was well-reasoned and was not clearly erroneous based on the record before him, including the transcript, the exhibits, and the procedural history of the case. The Hearing Officer could base his opinion and final report only on the record before him, as presented by the parties. The documents provided by the plaintiff in support of plaintiff's allegations remain unrefuted by defendant.

In his final report, the Hearing Officer found that Dr. Braude was not wrongfully terminated by the United States Information Agency (USIA), because she was terminated pursuant to the Supplemental Appropriation Act of 1954, Pub.L. No. 83–207, Ch. 340, 67 Stat. 418, 421 (1953), which required no statement of reasons for firing, nor compliance with due process. The Hearing Officer, however, also found that the USIA's blacklisting of Dr. Braude gave rise to an equitable claim based on tort, for which the plaintiff should recover equitable damages from the United States. The Hearing Officer instructed the parties to "endeavor" to reach agreement and to stipulate to the amount of damages, or, if unable to reach agreement, to file a status report setting forth their respective positions explaining why they were unable to reach such an agreement.

The parties filed a stipulation regarding damages on May 24, 1996. Following receipt of the stipulation from the parties, the Hearing Officer issued his final "Hearing Officer's Report" which in pertinent part, reads:

In its March 7, 1996, opinion, this court concluded that defendant blacklisted Dr. Braude and that this blacklisting constituted an equitable claim. *See Estate of Dr. Beatrice Braude v. United States*, 35 Fed. Cl. 99, 112–14 (1996). Pursuant to 28 U.S.C. § 2509(c), the court must also recommend to Congress the amount to which the plaintiff is equitably entitled.

In its March 7 decision, the court ordered that the parties, based on the factual findings and legal analysis therein, attempt to stipulate as to the amount equitably due plaintiff. On May 24, 1996, the parties filed such a stipulation. Pursuant to that stipulation, the court hereby recommends to Congress that plaintiff is equitably entitled to $200,000 from the United States.

Neither side filed an exception to the liability and damages findings in the Hearing Officer's report, as is permitted under the Rules of this court in Congressional Reference cases. *See* RCFC, appendix D, paragraphs 9 and 10. Moreover, on June 10, 1996, pursuant to RCFC Appendix D, paragraph 9, the government filed "Defendant's Notice in Response to the Hearing Officer's Report" which states in full:

Pursuant to the Hearing Officer's Report, dated June 3, 1996, defendant states that it accepts the conclusions contained in that report.

And, on June 11, 1996, also pursuant to RCFC Appendix D, paragraph 9, Dr. Braude's estate filed "Plaintiff's Notice of Acceptance of the Hearing Officer's Report" which states in full:

Pursuant to the Hearing Officer's Report of June 3, 1996 and to ¶ 9 of Appendix D of the Rules of the Court of Federal Claims, plaintiff hereby accepts the Report of the Hearing Officer.

Based on thorough reviews of the record, the majority members of the panel, hereby, adopt the findings on liability and damages contained in the Hearing Officer's report, as accepted by the plaintiff and the defendant, and recommend that the plaintiff should recover $200,000.00 in damages from the United States. In the event that the Congress rejects the findings contained in the Hearing Officer's opinion and report and determines that the plaintiff is not entitled to equitable damages, the majority members of the panel recommend that, based on the record, the plaintiff be awarded $200,000.00 as a gratuity, the amount stipulated to by the parties, and as permitted pursuant to 28 U.S.C. § 2509(c) and RCFC Appendix D, paragraph 8.

**IT IS SO ORDERED.**

### REVIEW PANEL MINORITY OPINION

WEINSTEIN, Judge, dissenting.

I respectfully dissent from the decision by the majority of the review panel adopting the findings and conclusions of the hearing offi-

cer in this congressional reference. I do so on several grounds: (1) because these claims do not arise from plaintiff's decedent's termination (which was not wrongful), and are thus beyond the scope of the reference; (2) because the facts alleged and proved are insufficient as a matter of law to state a claim of blacklisting (or any other recognized claim of negligence or wrongdoing); (3) because the findings of fact are clearly erroneous; (4) because a claim for blacklisting is barred by the Federal Tort Claims Act (FTCA); and (5) because the recommended damages are both beyond the scope of the reference and excessive. I believe the review panel has a duty to consider the hearing officer's report even when, as here, no exceptions were made by the "parties." *See* 28 U.S.C. § 2509(d) ("The findings and conclusions of the hearing officer *shall* be submitted ... to the review panel for review.... [T]he panel, by majority vote, *shall* adopt or modify the findings or the conclusions of the hearing officer....") (emphasis added); Rules of the United States Court of Federal Claims (RCFC) App. D ¶ 10; [1] *see also McQuown v. United States,* 199 Ct.Cl. 858, 861 (1972) ("the absence of formal exception by the losing party does not relieve the review panel of the substantive responsibilities assigned it by 28 U.S.C. § 2509(d)"). *Cf. Kerr–McGee Corp. v. United States,* 36 Fed.Cl. 776 (1996) (adopted by Review Panel on Dec. 13, 1996) (Compromise resolution accepted by hearing offer following extensive trial that yielded sharply conflicting expert opinion evidence.) [2]

This congressional reference case airs the Cold War accusations of Dr. Beatrice Braude, who was fired by the United States Information Agency (USIA) within the State Department in 1953, pursuant to a reduction-in-force law that required no statement of reasons, nor compliance with due process. *See* Supplemental Appropriation Act of 1954, Pub.L. No. 83–207, ch. 340, 67 Stat. 418, 421 (1953) ("P.L. 207") (permitting the USIA to terminate any employee "notwithstanding the provisions of any other law"). According to the legislative history, and as the hearing officer recognized, there can be no doubt that P.L. 207 was intended to be used to get rid of possibly disloyal employees. *See infra* at 483–484. Nevertheless, Dr. Braude staunchly maintained, until her death in 1988, that she was improperly fired because she was fired for security, instead of budgetary, reasons, and that she was "blacklisted" thereafter, as purportedly evidenced by the fact that until 1982 she was not hired for any of the numerous government positions for which she applied. [3]

The reference bill directed the court to make a recommendation with respect to "any claim for back pay ... arising out of the termination of Dr. Braude's employment at the [USIA]." S. 840, 103rd Cong., § 1 (1993).

The hearing officer properly concluded that Dr. Braude was not wrongfully terminated by the USIA, because she was terminated under the terms of P.L. 207, which permitted USIA to terminate employees "notwithstanding the provisions of any other law," *Estate of Braude v. United States,* 35 Fed.Cl. 99, 102, 110 (1996), *i.e.,* without stating any grounds. *See id.* at 111. That conclusion should have signaled the end of this case. However, the hearing officer, notwith-

1. RCFC App. D ¶ 10 provides: *"On the basis of the entire record,* the review panel, by majority vote, shall adopt or modify the findings or the conclusions of the hearing officer and *shall* file its report with the clerk, for service on the parties."* (Emphasis added.)

2. While defendant stipulated to damages, as required by the March 7, 1996 opinion of the hearing officer, *Estate of Braude v. United States,* 35 Fed.Cl. 99, 114 (1996), it is unclear whether it affirmatively accepted the reasoning of that opinion, or, instead, agreed merely to the stipulated amount, and acceded only to the hearing officer's report of June 3 entering the amount of that stipulation. *See* defendant's "Notice" of June 10, 1996. A damages stipulation, of course, general-

ly indicates merely the quantity of damages to be awarded in the event liability should be established, not that liability is conceded. *E.g., Pitcher v. Principal Mut. Life Ins. Co.,* 93 F.3d 407, 411 (7th Cir.1996) (parties stipulated to damages after trial but appealed liability determination). In any event, no exception was made to the reward based on that stipulation.

3. This was a long-standing campaign. as this well-educated woman persisted in applying for federal employment (for almost thirty years, until she finally secured employment with the Central Intelligence Agency in 1982), applying even for jobs clearly below her qualifications, for example, as a typist.

standing the government's objection, reached beyond the back pay claim to decide Dr. Braude's claim for "blacklisting," concluding, somewhat tautologically, that "the USIA's blacklisting of Dr. Braude gives rise to an equitable claim because the blacklisting constitutes tortious behavior and a tort constitutes government wrongdoing upon which an equitable claim can be based." *Id.* at 113.[4]

"[I]n order to recover under an equitable claim theory a claimant must show that: (1) the government committed a negligent or wrongful act, and (2) this act caused damage to the claimant." *California Canners & Growers, Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986) (quoting and adopting *Shane v. United States*, 3 Cl.Ct. 294, 304 (1983), *adopted*, Cong. Ref. No. 1–79 (Cl.Ct. Nov. 1, 1983), and citing *Sea–Gate, Inc. v. United States*, 4 Cl.Ct. 25, 30 (1983), *adopted*, Cong. Ref. No. 2–76 (Cl.Ct. Aug. 20, 1984)). As the hearing officer concluded, the cases now recognize that *negligence*, not mere "wrongfulness" or moral obligation, is the proper standard for equitable claims in congressional reference cases. *Estate of Braude*, 35 Fed. Cl. at 109 (citing *Spalding & Son, Inc. v. United States*, 28 Fed.Cl. 242, 250 (1993)).

The hearing officer not only exceeded the scope of the reference, he also appears to have intermingled the elements of blacklisting with those of wrongful termination. Wrongful termination is improper firing (for impermissible reasons or without requisite due process). *See, e.g., Ruffino v. State St. Bank & Trust Co.*, 908 F.Supp. 1019, 1052 (D.Mass.1995). Wrongful termination, the hearing officer conceded, did not occur here.

The tort of blacklisting, on the other hand, consists of intentionally and improperly interfering with another person's prospective contractual relation whether by inducing or causing the person not to enter into or by preventing entry into the relationship. *See Restatement (Second) of Torts* § 766B (1977). If the statement is true, however, it is not improper (that is, if the information given is truthful or honest advice within the scope of a request for advice). *Id.* § 772. Blacklisting is an intentional tort that is not recognized in the District of Columbia or most other jurisdictions. The elements of blacklisting—communication of false information, intent, causation—were not proved (or even alleged) in this case. Nor were the elements of any analogous torts—*e.g.*, intentional interference with contractual relations or malicious injury to reputation—either proved or alleged by plaintiff in this case.[5]

### Standard of review

A hearing officer shall "determine the facts," 28 U.S.C. § 2509(c), and "shall find the facts specially," RCFC App. D ¶ 8. "The hearing officer shall append to the findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due." *Id.* His legal conclusions are reviewable *de novo* by the review panel. *Alabama–Coushatta Tribe v. United States*, 1996 WL 409086, at *7 (July 22, 1996) (citing, *e.g., United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268 (1961)); *White Sands Ranchers v. United States*, 16 Cl.Ct. 13, 16 (1988).

His factual findings may not be set aside "unless clearly erroneous, and due regard shall be given to the opportunity of the hearing officer to judge the credibility of the witnesses." RCFC App. D ¶ 8. A finding is clearly erroneous when, although there is evidence to support it, the reviewer "on the

---

4. Inconsistently, the hearing officer uses the very same act he concludes is legally permitted by P.L. 207 to infer that the agency acted wrongfully: "Because Dr. Braude's termination was an act that the USIA could not have taken in good conscience, the subsequent blacklisting ... based on these same dubious concerns about loyalty and security demands similar criticism." *Estate of Braude*, 35 Fed.Cl. at 109.

5. *See Lance Indus., Inc. v. United States*, 3 Cl.Ct. 762, 775–76 (1983) (finding intentional tort beyond scope of reference to examine a claim sounding in negligence, noting that entertaining a reference beyond the scope of the referral conflicts with the jurisdiction conferred by 28 U.S.C. § 2509, the statute establishing court's authority to hear a reference). The *Lance Industries* court indicated that Congress likely did not contemplate waivers of meritorious defenses. *Id.* See also *Land v. United States*, 29 Fed.Cl. 744, 752 (1993) (citing, *e.g., Lance*).

entire evidence is left with the definite and firm conviction that a mistake has been committed." *Daff v. United States*, 78 F.3d 1566, 1571 (Fed.Cir.1996) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)).

The principal purpose for a congressional reference ("to conduct adversary proceedings, some quite protracted in nature" because "Congress is ill-suited to conduct [such proceedings]," II Wilson Cowen, Philip Nichols, Jr., and Marion T. Bennett, *The United States Court of Claims: A History* 96 (1978)) does not exist in this case, since no real adversary hearing was held and no new "facts" emerged during the proceedings in this court. At the "trial," which lasted only two hours, no percipient witness to the events testified. In fact, none of the three "witnesses" called (by the estate)—Dr. Braude's brother; one of Dr. Braude's friends; and Stanley Kutler, a historian who wrote a chapter regarding Dr. Braude in his book, *The American Inquisition* 33–58 (1982)—claimed any direct or personal knowledge of the events at issue. *Estate of Braude*, 35 Fed.Cl. at 105. There is no indication that any new evidence was presented to this forum in addition to whatever was made available to Dr. Kutler by Dr. Braude when he wrote his book and to Congress when the reference was made. Thus, the factual findings did not depend on the opportunity of the hearing officer to judge witness credibility. Consequently, the "re-

gard" due "to the opportunity of the hearing officer to judge the credibility of the witnesses," as provided by the rules governing congressional reference cases, under RCFC App. D ¶ 8, is negligible in this case.

The primary source for the hearing officer's findings is decedent's own 1977 affidavit (which is hearsay), and the exhibits that were appended thereto, such as her 1967 letter to the American Civil Liberties Union, Ex. 37 (also hearsay). The agency records for the periods in question (1953–1982), as well as agency witnesses to the events, were no longer available.[6]

Notwithstanding the rules of practice of the court, which are required to be applied "insofar as feasible" to congressional reference proceedings, 28 U.S. § 2509(b); *accord* RCFC App. D ¶ 1, and also notwithstanding the statutory mandate that this court employ the federal rules of evidence, 28 U.S.C. § 2503(b), the hearing officer refused to entertain the government's hearsay or other objections to the "evidence" compiled over the years by Dr. Braude and her attorneys (including her 1977 affidavit solely) because the government's attorney missed a pretrial cut-off date for including "arguments" regarding "documents in dispute," Order of March 23, 1995. Tr. 7. This deadline was established, not by court rules, but by order of the court, several months before trial. *See* Order of March 23, 1995. (The DOJ attorney mistook the deadline as one for authenticity, rather than admissibility, objections, Tr. 6.)[7] The order did not state that failure

---

6. Dr. Braude's unsuccessful employment applications (like any co-applicants') had been destroyed, pursuant to normal procedures. Ex. 31. At least one percipient witness, Reed Harris, was alive when Dr. Kutler wrote his book, but he declined to cooperate with Dr. Kutler. Tr. 68. Mr. Harris allegedly had been the subject of blacklisting himself, however, so it is unclear how his testimony would be evaluated. *See* Ex. 37 at 1. The record does not reveal whether Mr. Harris survives, or, if so, whether either party contacted him, even though his 1965 opinion (apparently personal) that Dr. Braude would not be given equal consideration was heavily relied upon by the hearing officer as evidence of official agency policy in earlier years. *See Estate of Braude*, 35 Fed.Cl. at 107–08.

7. As in *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C.Cir.1996), *cert. denied*, —— U.S.

——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997), the court's preclusion of defendant's hearsay or other evidentiary objections to the affidavit here "approaches a default judgment in its severity," because it left the defendant "with little ability to contest the plaintiff's claims." Such a severe sanction, "that results in a one-sided trial," was found to require support "by a finding of flagrant egregious misconduct by the defendant." *Id.* at 809. No such finding was made. Nor was a less severe remedy considered. *Id.*

Plaintiff's attorneys argued that the affidavit should be admitted under FRE 804(b)(5), the catch-all hearsay exception, because the government had an opportunity to cross-examine decedent in 1977, or because it was "almost admissible" as an "almost ancient" document. There is no evidence, however, that the government had an opportunity to cross-examine Dr. Braude about the affidavit in 1977, since the case never

to raise an argument would waive any objection.

No adversary fact-finding process existed throughout the proceeding, as the Department of Justice ceased actively contesting the charges at the hearing once its evidentiary objections were rejected on the foregoing procedural grounds. Justice presented no testimony, stipulated to a damages amount, and abandoned its post-trial arguments, making no exception to the hearing officer's report.

Based on the foregoing circumstances, this panel member concludes that the most suitable standard of review for the factual findings of the hearing officer in this case is non-deferential. *White Sands Ranchers*, 16 Cl. Ct. at 16. Even if the findings are not disturbed, however, they are insufficient as a matter of law to make out an equitable claim of blacklisting.

### Discussion

The hearing officer found that "the USIA (1) selected Dr. Braude for termination in 1953 based on questions about her loyalty to the United States, (2) intentionally concealed from Dr. Braude the true reasons for her termination, and (3) blacklisted Dr. Braude for a period of time after her termination." *Estate of Braude*, 35 Fed.Cl. at 102. He acknowledged that the first two findings did not make out a cause of action, because Dr. Braude's termination was not wrongful, be-

ing pursuant to statute and the statute not requiring that Dr. Braude be given any reason (true or not) for termination. *Id.* at 110–11. Further, failure to state the true (permissible) reason (security) would in fact redound to Dr. Braude's benefit, since it eliminated any stigmatic effect on her reputation. What is more, even if the reason were security grounds, the statement that the termination was pursuant to P.L. 207 was not inconsistent with that reason, given the stated purpose of the law, previously noted, to clear out possibly disloyal employees from the USIA.[8]

The hearing officer based the blacklisting conclusion on four findings: "(1) the acknowledged use of blacklisting during the McCarthy era, (2) Dr. Braude being a potential candidate for such blacklisting because she was terminated for loyalty and security reasons, (3) Dr. Braude's excellent employment credentials, and (4) a series of suspect actions that indicate that USIA officials were undermining Dr. Braude's employment efforts." *Id.* at 106. Direct evidence of these suspect "actions" appears to boil down to one event only—presented through triple or quadruple hearsay—an alleged telephone comment by one State Department (not USIA) official to a stranger in 1954.[9]

These findings, even if supported (which they are not), do not establish the elements of a claim for blacklisting or, for that matter,

reached the merits but was decided on summary judgment (on jurisdictional—statute of limitations—grounds). The ancient document exception applies only to documents 20 years old or older, FRE 803(16), which excluded the affidavit.

**8.** An unauthenticated document Dr. Braude alleged to be in her permanent "Official Personnel File," purportedly from the USIA Security Office, states: "On the basis of the information contained in the attached memorandum [the identity of the attachment is unclear, plaintiff's counsel being unable to represent that it set forth the information uncovered during the FBI/State Department Loyalty Security Board investigation, Tr. 25] the Office of Security recommends termination under Public Law 207." Ex. 21 at 1. The hearing officer concluded that this meant that the termination was "for loyalty and security reasons." *Estate of Braude*, 35 Fed.Cl. at 104. However, the Security Office report could have constituted merely one of the reports due from

each domain within the USIA as to whether P.L. 207 should be invoked. *See* Ex. 19 at 2 ("Coincident with [each organization unit head's] consideration, the Divisions of Personnel and Security reviewed the files of each employee concerned."). There is no specific evidence, in the report or elsewhere, as to the particular criterion (of the eight USIA criteria for P.L. 207 invocation, *see id.* at 1) that was used by the Security Office. Also, Dr. Braude might have been particularly susceptible to a reduction-in-force (not security) termination because she had only three weeks tenure in her job at USIA (having just been transferred from State) when she was terminated. *See* Ex. 6 at 4.

**9.** The 1965 statement by Reed Harris of the USIA that Dr. Braude would not then be given equal consideration to equally qualified candidates was obviously merely his own opinion. There was no evidence that this was agency policy, then, or during the previous decade.

for interference with contractual relations, damage to reputation, or any other similar tort, because they do not show malice, intent, falsity, or causation.

### I. Elements of blacklisting not proved (or alleged)

The source of the hearing officer's (and defendant's) definition of "blacklisting" as an equitable claim, Estate of Braude, 35 Fed.Cl. at 112, is not stated and has not been found by this panel member in the common law of any state.[10] Several states have recognized somewhat similar torts, e.g., Arizona, Georgia, and Pennsylvania, see Sherman v. Burke Contr., Inc., 891 F.2d 1527, 1541–42 (11th Cir.1990) (Tjoflat, C.J., concurring) (citing, e.g., Wagenseller v. Scottsdale Mem. Hosp., 147 Ariz. 370, 710 P.2d 1025, 1040–41 (1985); Luke v. DuPree, 158 Ga. 590, 124 S.E. 13, 16 (1924); Roseman v. Hassler, 382 F.Supp. 1328, 1340–41 (W.D.Pa.1974), aff'd sub nom. Roseman v. Indiana Univ., 520 F.2d 1364 (3rd Cir.1975)) (malicious and intentional interference with contract), Washington, see Su v. M/V Southern Aster, 978 F.2d 462, 474–75 (9th Cir.1992) (stigmatizing dismissal), and South Carolina, see Austin v. Torrington Co., 810 F.2d 416, 421 (4th Cir.1987) (willful or malicious use of blacklist by a combination of employers). However, all of these jurisdictions have required proof of malice or falsity (as well as causation) as an element of the claim.[11] · Even proposals for establishing such a tort have required malice, or falsity, and have exempted dissemination for business purposes, e.g., between agencies, as privileged. Austin, 810 F.2d at 421.

No specific evidence of malice or falsity (connected with blacklisting, as opposed to termination) has been alleged here, however. This is logical given that there is no evidence of any statement by any USIA official, orally or in writing, to any other agency, purporting to interfere with Dr. Braude's employment.

All the common law and statutory blacklisting actions also require a showing of causation, i.e., that an applicant would have been hired for a specific position but for the malicious exchange of false information among employers. Id.; Hull v. Central Transp., Inc., 628 F.Supp. 784, 793 (N.D.Ind.1986.) This requires, at a minimum, evidence that others with lesser qualifications were given preference in hiring. Austin, 810 F.2d at 421; Hull, 628 F.Supp. at 793. There is no evidence in the record, or any allegation, however, that a single specific applicant with lesser qualifications was hired in preference to Dr. Braude.[12] The court's "findings" on this issue are as vague as the plaintiff's allegations: "Dr. Braude's inability to secure at least some of the federal positions for which she applied [between 1953 and the mid-'60s] was the result of her being blacklisted," Estate of Braude, 35 Fed.Cl. at 105 (emphasis added); she would have gotten "at least one" absent blacklisting, id. at 106. The position(s) for which she was not hired, unfortunately, are neither specified nor proved. Nor are the mechanics of any blacklist in any such instance described, alleged, or proved.

The burden of establishing communication,

10. In congressional reference cases, the court looks to the lex locus delicti, or the law where the negligent act allegedly occurred, to determine tort liability. Land v. United States, 35 Fed.Cl. 345, 349 (1996). However, no tort of "blacklisting" has been recognized by the courts of the District of Columbia, where the tort allegedly occurred (or even in the adjoining jurisdictions of Virginia and Maryland).

11. Other states have established misdemeanor penalties for such actions. See, e.g., Calif. Labor Code § 1050 (misrepresentation preventing a former employee from obtaining employment). These, too, require proof of misrepresentation (to the other would-be employer), or malice, or falsity of the representation.

12. Although much was made of her "perfect" (100%) score on a civil service typing exam, Ex. 1 at 23; see Estate of Braude, 35 Fed.Cl. at 104, there is no indication of how many other applicants achieved the same score or whether anyone with a lesser score was hired. Dr. Braude's score on the Civil Service Exam (low seventies) did not place her within the category of applicants likely to be hired (low eighties or above). Ex. 36 at 2. In addition, the Civil Service Commission indicated that Dr. Braude was applying for positions for which there were many applicants. Ex. 36 at 1. (DOJ also reasonably noted that her failure to be hired could just as easily have been attributable. during that era, to her age (she was forty when she left USIA), sex, or religion (Jewish).)

falsity, misrepresentation, and malice [13] is on the plaintiff. Nevertheless, no particular evidence of malice by the USIA or State Department (as opposed to general conclusions or unsupported implications drawn solely from the fact that she was not hired) was alleged, or appears in the record.[14] There being no evidence regarding what was supposed to have been said by any individual at the State Department or the Civil Service Commission (CSC) or the USIA to any individual at any other agency, there perforce is no evidence that it was false, or not privileged.[15] If the only information communicated among the agencies was that she had been investigated (and cleared) by State (and there is no specific evidence alleged or presented that even this was communicated), such evidence would be insufficient because the information in such a communication was true (and presumptively privileged as an interagency communication). The same would hold true for informing a prospective employer that she was fired under authority of P.L. 207.

The hearing officer, with the benefit of hindsight, speculated as to the (true) reasoning of the USIA officials responsible for decedent's termination, but did not find that those officials, even if they actually fired decedent on the grounds that she was a possible security risk, did not genuinely or reasonably believe that she was.[16] *Cf. J.A. Zachariassen & Co. v. United States*, 136 Ct.Cl. 63, 141 F.Supp. 908, 911–12 (1956) (in congressional reference case, Court of Claims held that detention of ships based on reasonable grounds to suspect loyalty of crews did not give rise to equitable claim).

Further, such wrongdoing would relate to the termination, and would not necessarily be relevant to later alleged blacklisting. Without finding that some USIA official (or other government official, although the hearing officer refers only to the USIA) maliciously gave false information, it cannot be said that they or any one of them acted tortiously, for blacklisting or tortious interference with a prospective contractual relation require that the tortfeasor intend to interfere *improperly* with another's prospective contract, *Restatement (Second) of Torts* § 766B (1977), and the USIA officials' intent would not have been improper if they actually believed that decedent's "past associations suggested possible questions as to loyalty," Ex. 19 at 1 (P.L. 207 policy), or her "employment within the Agency [was not] clearly consistent with the interests of the national security," Ex. 20 at 1 (USIA security regulations). *See generally Prosser on Torts* § 129, at 982–85 (5th ed.1984).

Nor was there any evidence or allegation that plaintiff's State Department or USIA personnel files actually were shared with any agency after 1954.[17] On the contrary, the CSC stated in 1967 that the files never left their offices after 1954. Ex. 36 at 3. In effect, the sole "proof" of USIA blacklisting is the *post hoc* fallacy that, because she was not hired by another federal agency, it must have been due to her previous employer's (USIA's) actions.

---

**13.** Merely negligent blacklisting is not actionable unless there is physical harm, which was not alleged here. *See Restatement (Second) of Torts* § 766C (1977).

**14.** An intentional "determin[ation] not to be forthright with Dr. Braude" regarding her termination, *Estate of Braude*, 35 Fed.Cl. at 107, obviously evidences "intent" regarding the termination, which was legally permissible, not regarding the blacklisting.

**15.** The hearing officer at times concedes the lack of probative evidence: "[N]either party was able to present direct, clear, and unequivocal evidence as to the reasons why federal agencies repeatedly denied Dr. Braude's applications for employment." *Estate of Braude*, 35 Fed.Cl. at 105. Also: "The court [due to the lack of wit-

nesses] has been forced to piece together the pertinent facts, mostly from disparate documents which themselves are not without some ambiguity. As a result, the court cannot be certain as to precisely what happened...." *Id.*

**16.** One of the USIA standards for selecting employees for termination under P.L. 207 was whether "past activities or associations *suggest[ed] possible* questions as to loyalty." Exh. 19 at 1 (Criterion 5) (emphasis added). This criterion obviously did not require conclusive (or any) proof of disloyalty.

**17.** Dr. Braude's termination took effect at the beginning of February 1954.

## II. No factual support for blacklisting findings

The hearing officer's first basis for the blacklisting conclusion—the use of blacklisting during the McCarthy era—merely recites the obvious proposition that blacklisting was then possible. This may condemn an era, but obviously does nothing to establish that it was more probable than not that this particular person was "blacklisted."

The evidence that her stated grounds for termination, under P.L. 207, was pretextual and that she was improperly terminated instead for loyalty and security reasons (the second basis) is not only weak,[18] it is irrelevant, since it is clear from the legislative history of P.L. 207 that Congress intended P.L. 207 to be used precisely for dismissing persons suspected of disloyalty. See 99 Cong.Rec. 11,122 (1953) ("The authority which has recently been vested in the new head of the Information Agency must be forcefully exercised. Communist sympathizers, such as Bertram D. Wolfe ... must be removed from their positions of influence and replaced by people who are dedicated to the United States...."). Thus, whether "guilt by association" was the cause for a security concern and termination on that basis may be a morally charged question, but it is utterly irrelevant as a matter of law and equity given the broad legal authority of P.L. 207.

Nor is there any basis for a claim against the government based upon a government employee's mistruth. The hearing officer effectively conceded this point, concluding that improper concealment of the true cause for Dr. Braude's termination "does not present an equitable claim for compensation." Estate of Braude, 35 Fed.Cl. at 114.[19]

As for her "excellent employment credentials" (the third basis), the hearing officer referred to decedent's "high evaluations by her supervisors," Id. at 106; accord id. at 104 ("She ... consistently received high evaluations for her work."). However, except for one "Very Good," Ex. 15 at 4, the only evidence in the record consists of routine appraisal forms indicating that her work merely "me[t] required standards," Ex. 15 at 1–3. (Furthermore, "Very Good" is most likely not the highest rating, which probably would have been, as now, "Outstanding." See, e.g., Dunn v. United States Dep't. of Agric., 228 Ct.Cl. 129, 654 F.2d 64, 65 (1981).) Decedent herself described her ratings as merely "favorable." See Ex. 1 at 11. Moreover, as previously noted, when she took the civil service examination in 1963, she scored only in the low seventies, whereas the Civil Service Commission indicated that "hiring rarely dip[ped] below" grades in the low eighties. Ex. 36 at 2. Thus, there is absolutely no evidence to support the finding that her credentials were "excellent," even though the hearing officer gives it great weight, alluding to the finding of "excellent" qualifications or credibility at least six times during the course of the opinion.

The hearing officer's fourth basis for concluding that blacklisting occurred was that (unnamed) USIA officials undermined Dr. Braude's employment efforts. However, as previously noted, there is simply no direct evidence (or allegation) of any interference by any individual USIA official (named or even described) or of any communication by such an official regarding plaintiff's decedent with any other agency or agency official. Consequently, the necessary evidence regarding the intent or motivation of any such official does not exist.

The best available evidence from this period of time regarding causation—the grounds for decedent's failure to be hired—flatly contradicts certain of plaintiff's claims that decedent was blacklisted: In 1957, the General Counsel of the Civil Service Commission explained that decedent was not hired for a typist position at USIA, see Estate of Braude, 35 Fed.Cl. at 106, because decedent had inadvertently confused the agency about her availability. Ex. No. 29 to Ex. 1 (contained in district court record and incorporat-

---

18. It seems unlikely that, if security were the grounds, that decedent would have been retained (reappointed) as she was, for an additional 30–day period after her termination. See Ex. 36 at 2.

19. Elsewhere, without explaining the inconsistency, the hearing officer contended that "[USIA] owed [Dr. Braude] a truthful explanation." Estate of Braude, 35 Fed.Cl. at 109.

ed by Ex. 1 at 34 and Ex. 28 at 1). In 1967, the Chairman of the Civil Service Commission forwarded to decedent's attorney a staff report concluding that decedent was unsuccessful because she was "seeking jobs for which there [we]re many candidates and relatively few jobs." Ex. 36 at 1. This report also suggested that Dr. Braude herself was "'scaring off' employment prospects by volunteering a recitation of her past loyalty clearance problems." *Id.* It "found no indication that subject has been denied appointment from a civil service list of eligibles because of an unfavorable security determination by an agency," and stated that "official records concerning subject's past difficulties regarding loyalty are not 'following her around.'" *Id.* at 3. Rather, as previously noted, the report stated, and plaintiff submits no evidence to the contrary, that the files containing the record of her security investigation (and examination) had not been moved since 1954, *id., i.e.,* shortly after or at the time of her termination and well before most of her alleged nonhirings due to a blacklist.

What the hearing officer found to be the "most direct evidence of blacklisting," *Estate of Braude,* 35 Fed.Cl. at 106, is triple hearsay: a 1974 letter to decedent's attorney from a Frenchwoman named Andree Orienter stating that a Frenchman named Jean Lambert told her in 1954—twenty years earlier—that an unidentified person in the State Department personnel office told him (when or even in which language—French or English—is not clear) that decedent was "on 'the black list,'" Ex. 27 at 1. (Decedent's affidavit dated November 15, 1977 claiming that Ms. Orienter told her in 1958 what Mr. Lambert in 1954 said that the unidentified official had told him, Ex. 1 at 25, is, of course, *quadruple* hearsay.) There is no evidence in the record regarding the identities or motives of these people. The statements are vague, and appear to have been prepared in anticipation of litigation. Also, they are incredible on their face—it is inconceivable that someone at the State Department (even if he or she had knowledge of these events at USIA and authority to do so) would have told a French banker over the telephone that decedent had been "blacklisted" when, at the same time, the USIA was officially telling

her and Senator Ives that she had been terminated for budgetary reasons and that they were confident she would be rehired, *see Estate of Braude,* 35 Fed.Cl. at 107–08; Ex. 18 at 1.

Not only are the Civil Service Commission's explanations for decedent's difficulty in obtaining federal employment perfectly plausible, they are far more likely than plaintiff's lawyers' interpretation, which is that there was an almost three-decades-long conspiracy, by unnamed people in the USIA who did not know Dr. Braude, to keep her from obtaining a federal job. (Moreover, plaintiff has offered no explanation of why such a conspiracy would be limited to preventing decedent from finding a *federal* job, or, if it was not, of why decedent later was able to find very good jobs in television production and college and university teaching (she became a tenured associate professor at the University of Massachusetts in 1972) and ultimately, in 1982, was hired by a federal agency, in fact, one of the agencies most sensitive to security considerations, the Central Intelligence Agency! *Estate of Braude,* 35 Fed.Cl. at 102, 104; Tr. at 31.)

In any event, the burden of proving the claim is on plaintiff. Plaintiff did not come remotely close to doing so.

### III. *Elements of other similar torts not proved (or alleged)*

The tort of intentional interference with prospective contractual relations (which is recognized in the District of Columbia) was not pleaded or relied upon by the hearing officer. However, it too is inapplicable because (1) the government's employment relationship to an employee is not contractual, *United States v. Hopkins,* 427 U.S. 123, 126, 96 S.Ct. 2508, 2510–11, 49 L.Ed.2d 361 (1976); *Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 268 (1981), and (2) as with blacklisting, the record is devoid of allegations or evidence of specific acts showing malice or intentional interference. *See, e.g., Riddle v. Mondragon,* 83 F.3d 1197, 1202 (10th Cir.1996); *Early v. Bankers Life & Cas. Co.,* 959 F.2d 75, 79 (7th Cir.1992) (requiring more than merely conclusory state-

ment to withstand motion to dismiss for failure to state a claim).

Injury to reputation also is an intentional tort, requiring evidence of malice (or at least negligence), falsity, and publication. *See Restatement (Second) of Torts* § 558 (1977). There is no direct evidence in the record of any of these elements, other than by way of triple or quadruple hearsay, *see supra.*

### IV. *FTCA exclusion*

As the hearing officer recognized, *Estate of Braude,* 35 Fed.Cl. at 113, the FTCA expressly excludes "interference with contract rights" and other intentional torts from the government's waiver of sovereign immunity from tort liability. 28 U.S.C. § 2680(h) (excluding recovery upon "(a)ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights"). The law is clear that the FTCA is "the exclusive mode of recovery for the tort of a Government employee even when the FTCA itself precludes Government liability." *United States v. Smith,* 499 U.S. 160, 166, 111 S.Ct. 1180, 1185, 113 L.Ed.2d 134 (1991); *see also Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 427–29, 115 S.Ct. 2227, 2233, 132 L.Ed.2d 375 (1995). The hearing officer's conclusion that the FTCA is inapplicable to congressional reference claims, *Estate of Braude,* 35 Fed.Cl. at 113, is not supported by prior case law (or by the legislative history of or rules governing such references). *See Lance Indus., Inc. v. United States,* 3 Cl.Ct. 762, 775–76 (1983) (congressional references waive statute of limitations and similar defenses, not sovereign immunity to tort claims).

### V. *No basis for back pay damages*

The congressional reference instructed the court to "render judgment upon any claim *for back pay* by the estate of Dr. Beatrice Braude against the United States arising out of the termination of Dr. Braude's employ-

ment at the United States Information Agency on December 30, 1953." S. 840, 103rd Cong., § 1 (1993) (emphasis added). Thus, only back pay damages were authorized. Back pay liability, however, is based on a finding of wrongful termination (which the hearing officer concedes did not occur, *Estate of Braude,* 35 Fed.Cl. at 102, 110). *E.g., Barry v. Posi–Seal Int'l, Inc.,* 36 Conn.App. 1, 647 A.2d 1031, 1036 n. 2 (1994) (" 'Back pay' is generally defined as the difference between what the plaintiff could have earned had he not been wrongfully terminated and the amount he actually earned 'from the date of his termination until the date of the judgment.' ") (quoting *Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 159 (2nd Cir.1992)).

### VI. *Stipulated damages are excessive*

The parties stipulated to a damages award of $200,000, and the hearing officer recommended that the estate was entitled to that amount.[20] No breakdown of these damages is included in the stipulation or the June 3 order. This panel member does not accept the proposition that a hearing officer is bound (or excused from his or her independent statutory responsibility "to determine the facts" under the congressional reference statute, 28 U.S.C. § 2509(c), or to find the facts specially, RCFC App. D ¶ 8), by a settlement agreement or the stipulation of the parties. Even in non-congressional reference cases, a court need not invariably defer to every agreement between the parties. *See Martinez v. El Paso County,* 710 F.2d 1102, 1106 (5th Cir.1983) (court was not bound by a pretrial stipulation as to the amount of back pay to which plaintiff would be entitled where the evidence established that he was entitled to a lesser amount); *see also, e.g., Aero Spacelines, Inc. v. United States,* 208 Ct.Cl. 704, 530 F.2d 324, 334 (1976) ("the court will occasionally relieve a party of its stipulation 'if necessary to prevent an injustice, particularly where facts contrary to the stipulation are established by the evidence' ") (quoting *H.B. Zachry Co. v.*

---

20. The interest of Dr. Braude's estate, and its attorneys, in being awarded these damages appears to be academic. at best, the executor of her estate intending to donate these to Dr. Braude's

undergraduate *alma mater,* Hunter College of New York. Cindy Loose, *After 42 Years, a Trial to Clear Her Name,* Wash. Post, Nov. 4, 1995, at A1.

*United States,* 170 Ct.Cl. 115, 344 F.2d 352, 357 (1965)).

More importantly, it has been held consistently, since before the Court of Claims was established, that a court need not accept any stipulation to a question of law. *Swift & Co. v. Hocking Valley Ry. Co.,* 243 U.S. 281, 289, 37 S.Ct. 287, 289–90, 61 L.Ed. 722 (1917); *California v. San Pablo & Tulare R.R. Co.,* 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893); *Lord v. Veazie,* 49 U.S. (8 How.) 251, 255, 12 L.Ed. 1067 (1850). Nor need a court accept a stipulation to a question of fact that is incorrect, particularly if it entails a legal effect (such as to invest the court with jurisdiction). *San Pablo,* 149 U.S. at 314, 13 S.Ct. at 878; *Elgin v. Marshall,* 106 U.S. 578, 579, 1 S.Ct. 484, 485–86, 27 L.Ed. 249 (1883) (jurisdiction cannot be conferred by consent of the parties). Such a stipulation is treated as a nullity. When the legal and factual basis for a stipulation is not spelled out, as here, the court cannot be confident that it is not based on incorrect facts or erroneous principles of law.

A reason to view stipulations with even greater distrust in congressional reference cases is that, due to the Justice Department's political role as a member of the executive branch and the nature of these cases, the Justice Department's interest in a given case may in fact not be adversarial to a particular congressional reference claimant. Nevertheless, the court is bound, in this review panel member's opinion, to do as it is asked by Congress—to find the objective facts upon which Congress may make its determination—and not merely to rubber stamp a claimant's, or even the Justice Department's. conclusion in a given case. *See OPM v. Richmond,* 496 U.S. 414, 435, 110 S.Ct. 2465, 2477, 110 L.Ed.2d 387 (1990) ("The Executive Branch does not have the dispensing power on its own, and should not be granted such a power by judicial authorization.") (citing *Kendall v. United States ex rel. Stokes,* 37

U.S. (12 Pet.) 524, 613, 9 L.Ed. 1181 (1838)) (White, J., concurring).

As noted earlier, the private relief bill authorized only a recommendation regarding an award of back pay for wrongful discharge, whereas damages for blacklisting are tort damages, not back pay. Again, however, the hearing officer did not find Dr. Braude's discharge to be wrongful. Similarly, plaintiff's request for compensation for decedent's emotional distress, Tr. 18, is not only not proven (or the elements alleged),[21] it too is beyond the scope of the bill. *Hulsey v. United States,* 6 Cl.Ct. 593, 596 (1984) (damages beyond the scope of the reference may not be awarded).

Plaintiff requested interest on the "back pay" award, Tr. 17, but interest is permitted in congressional reference cases only when a statute waives the government's sovereign immunity against interest on the particular category of damages found. *Gay St. Corp. v. United States,* 130 Ct.Cl. 341, 350, 127 F.Supp. 585 (1955); *see, e.g., Spalding & Son, Inc. v. United States,* 24 Cl.Ct. 112, 161–62 (1991) (interest available in congressional reference case arising from government contract because Contract Disputes Act authorizes interest), *modified on other grounds,* 28 Fed.Cl. 242 (1993). Interest is available under the Back Pay Act, 5 U.S.C. § 5596(b)(2), but a failure to hire does not state a claim under that act, *Lewis v. General Services Administration,* 54 M.S.P.R. 120, 123 (1992). Moreover, the statute was not in effect during the years of the alleged blacklisting. *See* Pub.L. 89–380, 80 Stat. 94 (1966). Because interest is not available under any applicable statute, or even under the FTCA, 28 U.S.C. § 2674 (which, as the hearing officer stated, does not apply), the recommended award should not include interest.

In any event, decedent's 1977 complaint sought only $75,000 in back pay, plus an unspecified sum for fringe benefits.[22] (The current complaint does not allocate the damages requested between back pay and fringe

---

21. The elements of emotional distress must include physical harm, which plaintiff never alleged. *See Restatement (Second) of Torts,* §§ 312, 313 (1977).

22. I do not read the congressional reference to include fringe benefits, for when Congress intends to reference back pay and fringe benefits, it does so expressly. *See, e.g.,* 5 U.S.C. § 1221(g)(1)(A)(ii); 10 U.S.C. § 2409(c)(1)(B); 41 U.S.C. § 265(c)(1)(B).

benefits.) Decedent did not incur any additional damages after 1977, because, as the hearing officer found, the political climate had shifted by then (indeed, ten years earlier) and decedent's alleged government blacklisting no longer would have interfered with her government employment prospects. *Estate of Braude*, 35 Fed.Cl. at 106–07 n. 10.

If the $75,000 figure was anywhere close to being correct, and interest is not allowed, the hearing officer should not have accepted the $200,000 figure without requiring further explanation from the parties as to its basis. *Lance Indus.*, 3 Cl.Ct. at 774; *see North Counties Hydro–Elec. Co. v. United States*, 170 Ct.Cl. 241, 250, 1965 WL 8252 (1965). "The trial court has a duty to reject stipulations which are demonstrably false." *Dillon, Read & Co. v. United States*, 875 F.2d 293, 300 (Fed.Cir.1989). *See also Kerr–McGee Corp., v. United States, Supra*, (allowing stipulation of fact in Congressional Reference case, but only after extensive trial of facts).

### Conclusion

The hearing officer stated that "the court cannot be certain as to precisely what happened regarding Dr. Braude between 1953 and 1982. The law, however, does not demand certainty." *Estate of Braude*, 35 Fed. Cl. at 105. This member of the review panel feels constrained to disagree, noting that in dealing with such situations (where there is no or inadequate evidence), the law utilizes

the allocation of burdens of proof. Plaintiff bears the burden of proof in this case; therefore, lacking any certainty whatsoever regarding the events in question, plaintiff cannot prevail on its claim. Plaintiff's burden of proof should not be deemed discharged based merely on personal or political sympathy or historical generalizations (*i.e.*, merely because the USIA allegedly acted "in the context of the politically charged atmosphere of the time," *id.* at 106, or during the "dark era in American history when Senator Joseph R. McCarthy was a political force," *id.* at 101).[23]

The private relief bill took no position on the merits of plaintiff's claim. S. 840, 103rd Cong., § 2 (1993). The purpose was solely to "waive the statute of limitations and allow her estate to have a hearing on the merits" of the back pay claim decedent brought in the Court of Claims in 1977, which was found to be untimely, *see Braude v. United States*, 218 Ct.Cl. 270, 585 F.2d 1049, 1053–54 (1978). 139 Cong. Rec. § 5179 (daily ed. Apr. 29, 1993).

While Congress may have relieved plaintiff of the bar of the statute of limitations, it did not abolish plaintiff's burden of proof, nor excuse plaintiff from meeting it merely because, in the intervening forty years, memories had faded, or sufficient evidence to establish liability had been lost. *Land v. United States*, 35 Fed.Cl. 345, 352 (1996).[24]

---

**23.** The hearing officer's gracious remarks to Dr. Braude's family and friends at the close of the plaintiff's evidence (and trial) were widely quoted both by the press and in plaintiff's post-trial briefs. He stated:

> I've heard from a dear friend of ... Dr. Braude, and I've heard from her brother and I've felt the other friends that are here today. And to get loyalty and support like that, indeed it's clear that Ms. Braude was an extraordinary person. Loyalty of a family and friends indicates to me very clearly that she probably would have been an extraordinary government employee....
> As to the reasons why [she was fired], I'm sure they perplex all of us now. How did these casual acquaintances that she ha[d] ever take away ... her career. It's inexplicable to somebody of this generation and I guess it can only be understood by bringing yourself back to a prior generation. In a sense, as I've heard it today it was life tragedy in that Dr. Braude

couldn't have the career in public service that she wanted.

Tr. 89–90.

In discussing the legislative history of P.L. 207, he described floor manager Representative Busbey as "[perhaps] very caught up in the times and apparently believing of a threat that perhaps history didn't prove was there." Tr. 91.

**24.** The sparseness of the record and the impossibility of obtaining evidence regarding the circumstances surrounding the termination, over forty years ago, and the events of the next decade, exemplify the essential purpose of a statute of limitations to protect against stale accusations and the loss of evidence. *See United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979) ("Statutes of limitations ... protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of

In this review panel member's opinion, plaintiff failed to show or even allege specific evidence of malice, or intent, or causation and therefore has proved no equitable claim for blacklisting. It is not "equitable" that a claim that would have been dismissed on the merits had it been timely filed should be granted without proof merely *because* it is untimely. *See O'Donnell v. United States,* 166 Ct.Cl. 107, 119, 1964 WL 8622 (1964) (this court in congressional reference cases disregards only the statute of limitations, but decides the merits) (Whitaker, J., concurring).

This panel member recognizes that Congress is not bound by the recommendation of this court in a congressional reference case. Having enacted the congressional statute, however, Congress is entitled to receive a recommendation that meets the statute's requirements.

For the reasons stated above, which are based solely on the legal sufficiency of the claim, I must dissent from the review panel's decision adopting the findings and conclusions of the hearing officer. This member of the review panel is persuaded that plaintiff has neither stated nor proven a legal or equitable claim for blacklisting, there having been no proper finding of intentional unprivileged communication by the USIA or any other agency causing plaintiff's decedent not to be hired when less qualified applicants were. Therefore, the claim of the estate is a mere gratuity. Even if recovery were allowed it should be limited, as was the reference, to back pay damages, which, no interest being allowed, should have been capped at $75,000, or the amount of her lost pay offset by her earnings.

documents, or otherwise."). (Such concerns doubtless also underlie the House of Representatives' standing rule prohibiting consideration under the congressional reference procedure of claims accruing more than fifteen years earlier. *See* House Comm. on the Judiciary, Subcomm. on Immigration and Claims, 104th Cong., *Rules of Procedure for Private Claims Bill* ¶ 4.)

Both the House, *id.* ¶ 7, and Senate, Senate Comm. on the Judiciary, Subcomm. on Admin. Oversight and the Courts, 105th Cong., *Standards to Be Used in Adjudicating Private Claims Bills* ¶ 8, have rules providing that claims for compensation, pensions, and benefits for government employees will not be entertained if the compensation, pension, or benefit is covered by a gener-

ally applicable statute. Whether this reference should have been barred by this rule is unclear, since Dr. Braude's termination predated the enactment of, *e.g.,* the Back Pay Act, but the reason for the rule—that giving consideration to selected government employees "would be discriminatory and would set the precedent for an unending stream of similar private legislation," *Rules of Procedure for Private Claims Bills* ¶ 7—apply with full force, for there is no telling how many former (or frustrated potential) government employees (or their estates), whose claims otherwise would be time-barred, might assert blacklisting claims. However, these rules entail political questions for Congress, not this court, to decide.